[No. B081742. Second Dist., Div. Three. Jan. 11, 1996.]

MICHELE KLEIN et al., Plaintiffs and Appellants, v.
BIA HOTEL CORPORATION et al., Defendants and Respondents.

**COUNSEL**

Mark W. Plank for Plaintiffs and Appellants.

Schreiber & Horn and Mark Schreiber for Defendants and Respondents.

## OPINION

CROSKEY, J.—Plaintiffs Michele Klein and Leland Baum (plaintiffs) appeal from a summary judgment entered in favor of defendant BIA Hotel Corporation, a California corporation doing business as the Hancock Park Retirement Hotel (defendant). Plaintiffs sued defendant for the wrongful death of their mother, Rose Goldbaum (decedent). Decedent had been living at defendant's residential hotel facility for the elderly. She died during her stay there.

Plaintiffs' complaint alleges eight causes of action for negligence in the running of defendant's residential care facility, all of them based on defendant's alleged failure to comply with the California Code of Regulations. The complaint alleges defendant's negligence was the proximate cause of decedent's death. The summary judgment was entered after the court determined defendant has a complete defense to the eight causes of action. That defense is based on the coroner's report, which states the decedent took her own life by jumping off of the roof of defendant's five-story facility.[1] Defendant's position is that decedent had a right to take her own life and defendant had no duty to prevent her from doing so. We do not find these contentions warrant granting defendant a summary judgment since defendant had regulations which it was obliged to follow on decedent's behalf, and since defendant had a special relationship with decedent. We therefore reverse the summary judgment and remand the case for further proceedings.

### BACKGROUND OF THE CASE

Decedent was a resident at defendant's residential care facility for the elderly. She lived there with her sister. On the roof of the facility is a patio area which is furnished with tables and chairs and which is used by the residents of the facility. The roof is accessible by elevator and by stairs. The patio area of the roof is fenced in. However, there is a gate through which one can leave the fenced-in patio area and go to the edge of the roof. On March 10, 1992, when she was 85 years old, decedent's lifeless body was discovered lying on the ground near the facility. On the roof of the facility, directly above where decedent's body was located, a police officer and an investigator from the coroner's office found a chair sitting outside the fenced patio area. (It was not the only chair on the unfenced portion of the roof.) There is evidence that on March 9, 1992, decedent told her sister and her daughter (one of the plaintiffs in this case) that she wanted to kill herself but the sister and daughter did not think decedent was capable of doing it. There

---

[1] Although plaintiffs question the coroner's conclusion that the decedent took her own life, for purposes of this appeal only, plaintiffs concede the point.

is also evidence that decedent did not tell her daughter that she desired to take her own life. There was evidence decedent had attempted suicide two years earlier by overdosing on prescription medicine. Decedent had previously had cancer and although her doctor believed the cancer was gone, two weeks before she died she was diagnosed with cancer again. There was evidence the new cancer was treatable and was not life threatening. The coroner concluded decedent had taken her own life.

Defendant's facility is licensed by the State of California, through its Department of Social Services, as a residential care facility for the elderly. As such, it is governed by title 22, division 6, chapter 8 of the California Code of Regulations (the regulations). Like a hotel, it provides rooms, maid service, linen service and dining facilities. However, because of its duties under the regulations, defendant's residential care facility provides much more, and much more is required of it. Defendant must have staff members who have the skill and knowledge required for necessary resident care, assisting residents with prescribed medications which are self-administered, and recognizing early signs of illness and the need for professional help. (Cal. Code Regs., tit. 22, § 87565.)[2] Prior to accepting a person as a resident, the residential care facility must conduct an interview with that person and with "his responsible person," and must also obtain, and keep on file, "documentation of a medical assessment, signed by a physician, made within the last year." (§§ 87567, 87569.) The residential care facility must also keep records (name, address, phone number), regarding the resident's responsible person, physician, dentist, religious preference and clergyman (if any), as well as a continuing record of "any illness, injury, or medical or dental care, when it impacts the resident's ability to function or the services he needs," and a record of his current centrally stored medications. (§ 87570.) The residential care facility must provide "assistance and care for the resident in those activities of daily living which the resident is unable to do for himself/herself." (§ 87578.) The residential care facility must also provide planned activities which, among other things, address its residents' socialization, foster independent functioning, "develop and maintain strength, coordination and range of motion," and cultivate personal interests and pursuits. (§ 87579.) Among the factors to be considered in the pre-admission evaluation of the resident is his or her mental condition. "The facility shall determine the amount of supervision necessary by assessing the applicant's mental status to determine if the individual tends to wander, is confused or forgetful, is capable of managing his/her own cash resources, and if he/she actively participates in social activities or is withdrawn." (§ 87585.) "The preadmission appraisal shall be updated, in writing as frequently as necessary to note significant changes and to keep the appraisal accurate. The

---

[2]Unless otherwise indicated, all section references herein are to title 22 of the California Code of Regulations.

reappraisals shall document changes in the resident's physical, mental and/or social condition. . . . [¶] . . . [¶] The licensee shall immediately bring any such changes to the attention of the resident's physician and his family or responsible person." (§ 87587.) "The licensee shall regularly observe each resident for changes in physical, mental, emotional and social functioning." (§ 87591.)

In their complaint, plaintiffs allege defendant violated provisions in the regulations by "failing or refusing to sufficiently, adequately or frequently obtain or complete admission appraisals and reappraisals," by "failing or refusing to notify resident's physician or family of changes in resident's mental state," by "failing or refusing to determine the amount of supervision necessary to determine if decedent resident was withdrawn and/or that the facility was capable of providing a safe residence," and by "failing or refusing to sufficiently, adequately or frequently observe decedent resident for changes in her mental, emotional or social functioning." Plaintiffs allege these violations of the regulations were the proximate cause of plaintiffs' damages. They further allege defendant is presumed to be negligent under Evidence Code section 669.[3]

Additionally, plaintiffs allege violations of the regulations which govern the physical setting of a residential care facility for the elderly. Specifically, they allege causes of action for violation of former section 87712[4] (failure to secure the doors to the roof area of the facility with a buzzer or bell or other auditory device to alert staff when the door is opened), and sections 87572 and 87577 (failure to provide safe and healthful accommodations by failing to adequately maintain the exterior doors or provide supervision of the use of the roof area or maintain adequate precautionary measures so as to prevent a resident from accidentally or intentionally falling from the roof). Plaintiffs allege these violations of the regulations were the proximate cause of their damages and further allege that under Evidence Code section 669, defendant is presumed to be negligent.

---

[3]Evidence Code section 669 states in relevant part: "(a) The failure of a person to exercise due care is presumed if:
"(1)   He violated a statute, ordinance, or regulation of a public entity;
"(2)   The violation proximately caused death or injury to person or property;
"(3)   The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and
"(4)   The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.
"(b)   This presumption may be rebutted by proof that:
"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. . . ."
[4]During the pendency of this appeal, section 87712 was renumbered as section 87724.

Defendant's answer denies the charging allegations and alleges several affirmative defenses, one of which is assumption of the risk. The answer alleges decedent "knew of the hazards and risks of her actions and had full knowledge of the conditions existing and appreciated the risk of her actions." In its motion for summary judgment, defendant contended suicide is not a wrong but rather is an exercise of a constitutionally protected right under one's right to privacy and, therefore, the allegations in the complaint of defendant's negligence are irrelevant. Citing *Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278 [253 Cal.Rptr. 97, 763 P.2d 948], defendant also argued it had no duty to exercise reasonable care to prevent decedent from taking her own life because the law only imposes such a duty on those with special relationships with a suicidal person—hospitals and other facilities which accept the responsibility to care for suicidal patients, and the patient's treating psychiatrist—and does not impose such a duty on persons who merely foresee that a person might take their life or have knowledge of such danger. The trial court ruled this constituted a complete defense to plaintiffs' causes of action and granted summary judgment.

CONTENTIONS ON APPEAL

1. In this appeal, plaintiffs contend there is no constitutional right to commit suicide. They argue that defendant's assertion of such a right is the result of its misreading of the decision in *Bouvia* v. *Superior Court* (1986) 179 Cal.App.3d 1127 [225 Cal.Rptr. 297], wherein the court held that a patient in a county hospital had the right to refuse forced feeding as medical treatment, even if it meant she would die as a result.

2. Plaintiffs further contend that even if there is a constitutional right to commit suicide, such a right will not serve to immunize defendant from liability for failing to abide by state regulations governing defendant's operations, specifically, regulations which if followed, would have ensured that decedent was not able to take her own life by jumping off the roof of the facility. Plaintiffs assert that such failure to abide by the regulations puts defendant in the position of being an aider of suicidal persons, since it provided the means and opportunity for decedent's suicide, and this is something which has already been determined to be wrongful. (*Donaldson* v. *Lungren* (1992) 2 Cal.App.4th 1614, 1623-1625 [4 Cal.Rptr.2d 59].)

Plaintiffs also contend that the logical extension of defendant's position regarding a right to commit suicide is that a failure by defendant to provide adequately for its residents by abiding by state regulations will have no consequences to defendant if the patient who is affected by defendant's violations of regulations is someone who takes her own life rather than

someone who is "simply" injured on defendant's premises. Under such circumstances then, the ultimate result of defendant's neglect is the very thing which gives defendant immunity from liability for its negligence and disregard of regulations. Plaintiffs argue this has the effect of rewarding neglect rather than punishing and preventing it.

3.   Additionally, plaintiffs assert defendant had a duty of care to decedent to *prevent* her death because the regulations which govern defendant's residential care facility for the elderly make that facility similar to a hospital or nursing home. Plaintiffs argue defendant's facility is a licensed and highly regulated commercial enterprise and thus the reasoning in *Nally* v. *Grace Community Church*, *supra*, 47 Cal.3d 278, which held that nontherapist counselors at defendant church had no duty to prevent potentially suicidal persons from committing suicide, does not apply here.[5]

4.   Lastly, plaintiffs assert that since defendant's motion for summary judgment was (1) based solely on its alleged complete affirmative defense and (2) did not attempt in any way to negative any of the elements of plaintiffs' causes of action, the summary judgment must be reversed and the cause remanded.

## DISCUSSION

### 1.   *Introduction*

Regarding plaintiffs' first contention, we decline to address the question whether there is a constitutional right to take one's own life.[6] Assuming arguendo there is such a constitutional right, as we explain below, the facts of this case warrant a conclusion that such a right is irrelevant here.

[5]One of the public policy considerations which the *Nally* court stated warranted not imposing a duty of care on religious counselors was the fact that ". . . the Legislature has exempted the clergy from the licensing requirements applicable to marriage, family, child and domestic counselors [citation] and from the operation of statutes regulating psychologists [citation]. In so doing, the Legislature has recognized that access to the clergy for counseling should be free from state imposed counseling standards, and that 'the secular state is not equipped to ascertain the competence of counseling when performed by those affiliated with religious organizations.' [Citation.]" (*Nally* v. *Grace Community Church*, *supra*, 47 Cal.3d at p. 298.) Another public policy reason cited by the court was that ". . . extending liability to voluntary, noncommercial and noncustodial relationships is contrary to the trend in the Legislature to encourage private assistance efforts." (*Ibid.*)

[6]In *Donaldson* v. *Lungren*, *supra*, 2 Cal.App.4th 1614, 1622, 1624, the court said a person may take his own life, noting that neither suicide nor attempted suicide is a crime in California, and further noting that suicide and attempted suicide are thought to be expressions of mental illness. The court cited *In re Joseph G.* (1983) 34 Cal.3d 429, 433-434 [194 Cal.Rptr. 163, 667 P.2d 1176, 40 A.L.R.4th 690].

## 2. Defendant's Duties to Decedent

### a. Analysis Under the Doctrine of Negligence Per Se

■ "Section 669 of the Evidence Code sets forth the doctrine commonly called negligence per se. It provides that negligence of a person is presumed if he violated a statute or regulation of a public entity, if the injury resulted from an occurrence that the regulation was designed to prevent, and if the person injured was within the class for whose protection the regulation was adopted. This presumption may be rebutted by proof that the violator did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 544-545 [208 Cal.Rptr. 874, 691 P.2d 630], fn. omitted.)

■ In their complaint, plaintiffs allege defendant was negligent per se. However, defendant's motion for summary judgment did not address the elements of a "negligence per se" cause of action, as those elements relate to the specific allegations in plaintiffs' complaint. Rather, defendant's motion was based on its contention that decedent's own acts and decisions were the cause of her death, that she had a constitutional right to take her own life, and that defendant had no duty to stop her because it was not operating a hospital or facility that cares for suicidal patients.

This defense would have more meaning if defendant owned, for example, a parking facility, a mall, an athletic stadium, or an office building, and the decedent had taken her life there. However, she took her life at a facility where defendant was required by law to monitor, to some degree, her health and well-being, to inform certain persons of changes in her condition, and to determine whether the facility would be able to continue to care for her because of those changes. The obligations imposed on defendant were obviously designed to prevent decedent's mental and physical problems from going unnoticed and untreated, so that harm to decedent could be avoided. When one puts oneself in the care of another to that extent, one is impliedly saying that she desires the care facility to prevent harm from coming to her, *even self-inflicted harm* of the type which occurred in this case. Thus, while decedent may have otherwise had a per se right to end her life, a question not relevant here, under the circumstances of this case, her act of placing her mental health in the observatory care of defendant indicated that she wanted to have that right impacted.

We do not mean to say defendant was a guarantor of decedent's health and well-being. Thus, we do not subscribe to plaintiffs' contention that

defendant had an absolute duty to *prevent* decedent's suicide. Instead, we focus on the fact that defendant had duties under the regulations which, if followed, *may* have prevented decedent's death. Decedent was a member of the class of persons designed to be protected by the regulations. Clearly, the regulations were designed to protect residents of residential care facilities for the elderly from, among other things, harm such as decedent experienced. Clearly plaintiff's loss resulted "from an occurrence of the nature which the [regulations were] designed to prevent." (Evid. Code, § 669.) By taking decedent as a resident at its care facility, defendant agreed, for her benefit, to abide by the regulations. Thus, defendant had the duty to exercise the care called for in those regulations. Whether defendant violated the regulations and, if it did, whether such violations were the proximate cause of decedent's death, are questions yet to be resolved.

### b. *Analysis Under Nally v. Grace Community Church*

In *Nally* v. *Grace Community Church, supra*, 47 Cal.3d 278, the court observed it "ha[s] imposed a duty to prevent a foreseeable suicide only when a special relationship existed between the suicidal individual and the defendant or its agents." (*Id.* at p. 293.) The court was referring to its decisions in *Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420 [71 Cal.Rptr. 903, 445 P.2d 519] and *Vistica* v. *Presbyterian Hospital* (1967) 67 Cal.2d 465 [62 Cal.Rptr. 577, 432 P.2d 193], wherein the court discussed the duty imposed on hospitals towards their patients. In *Vistica*, at page 469 of its opinion, the court stated: "The circumstances here are that a mentally ill patient was confined for care and treatment in the psychiatric ward of defendant hospital; the duty imposed by law on the hospital is that it must exercise such reasonable care toward a patient as his mental and physical condition, if known, require; the duty extends to safeguarding the patient from dangers due to mental incapacity; and where the hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself or others unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm. (*Wood* v. *Samaritan Institution, Inc.* [1945] 26 Cal.2d 847, 851 . . . .)" (Accord, *Meier* v. *Ross General Hospital, supra*, 69 Cal.2d at p. 424.) Absent such reasonable care, the treating doctor and the hospital can be liable even though the suicidal patient's acts which preceded her injuries were "voluntary." That is, the doctor and the hospital must use reasonable care to prevent the patient from harming herself by her own acts, be they voluntary or involuntary. (*Vistica, supra*, at pp. 470-471; *Meier, supra*, at pp. 423-424.)

Although defendant is not a mental institution and apparently does not operate a psychiatric ward,[7] it nevertheless assumed a special relationship with decedent when it agreed to have her as a resident in its facility for the care of the elderly, and thereby expressly, or at least impliedly, agreed to execute the duties imposed upon it, by the regulations, to monitor her and report changes and conditions in her physical and mental health. Obviously, besides simply monitoring the decedent and reporting changes and conditions, defendant would also have the duty to exercise reasonable care to prevent decedent from harming herself if it had knowledge or notice of facts from which it might reasonably conclude that decedent was likely to harm herself unless protective measures were taken, even if exercising such reasonable care meant only that defendant took measures to keep decedent safe until decedent's responsible person could move her to a more secure facility.[8]

## 3. Conclusion

Questions remain to be answered in this case. For example, did defendant live up to its obligations as defined in the regulations; did defendant have knowledge or notice of facts from which it could reasonably conclude it needed to take protective measures on decedent's behalf; did defendant exercise reasonable care to prevent decedent from harming herself; was any dereliction of duty by defendant a substantial factor in causing the death of decedent? Those questions can be answered upon remand of the case.

---

[7]A duty of care to a person who is a potential suicide has been found in a situation not involving mental hospitals or wards. In *Johnson* v. *County of Los Angeles* (1983) 143 Cal.App.3d 298 [191 Cal.Rptr. 704], the court ruled (1) deputy sheriffs who had custody of a person they found driving the wrong way on a freeway had a special relationship with him and with his wife and daughter (who were the plaintiffs in the case), and (2) the deputies had a duty to warn the plaintiffs that they intended to release the prisoner from custody before they released him. Upon arresting the prisoner, the deputies had been informed by him that he was driving the wrong way because he wanted to kill himself. Shortly thereafter, the prisoner's wife informed the deputies that the prisoner was a paranoid schizophrenic who had been hospitalized repeatedly for his condition, who needed medication for the condition, and who had suicidal tendencies requiring immediate medical attention. She requested that he not be released. Although they promised to hospitalize and medicate the prisoner and told the wife not to worry or interfere, the deputies released him from jail without notice to the wife and the prisoner committed suicide. The deputies' acts had made the prisoner and the plaintiffs dependent on them for protection from the prisoner's own acts.

[8]It is to be noted that after decedent died, the state Department of Social Services requested certain things from defendant "[t]o assist [defendant] in monitoring suicidal potential in residents."

## DISPOSITION

The judgment is reversed and the cause remanded for further proceedings consistent with the views expressed herein. Costs on appeal to plaintiffs.

Klein, P. J., and Aldrich, J., concurred.

Respondents' petition for review by the Supreme Court was denied March 21, 1996.