[No. D039240. Fourth Dist., Div. One. Mar. 26, 2003.]

NANCY NORMAN, Plaintiff and Appellant, v.
LIFE CARE CENTERS OF AMERICA, INC., et al., Defendants and
Respondents.

**COUNSEL**

Finkelstein & Finkelstein, Norman M. Finkelstein and Julianne Mizer for Plaintiff and Appellant.

Houck & Balisok, Russell S. Balisok, Steven C. Wilheim and Patricia L. Canner for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Lucas, Mullany, Boyer & Haverkamp, Linda Hunt Mullany, Patricia Jo Custer, Karen M. Stuckey and Eugenia Liu for Defendants and Respondents.

Hooper, Lundy & Bookman, Mark E. Reagan, Mark A. Johnson and Berta H. Schweinberger for California Association of Health Facilities as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**McDONALD, J.**—Plaintiff Nancy Norman, individually and as successor in interest of decedent Dorothy Quartermaine, appeals a judgment following a jury verdict in favor of defendants Life Care Centers of America, Inc., Life Care Center of Vista, and Vista Medical Investors (collectively LifeCare) in her elder abuse and wrongful death action against LifeCare. Norman contends the trial court prejudicially erred by: (1) refusing to instruct on negligence per se (BAJI No. 3.45); (2) excluding evidence of records of the State Department of Health Services (DHS) regarding LifeCare's violations of regulations in caring for other patients; and (3) excluding part of DHS's records regarding LifeCare's violation of regulations in caring for Quartermaine. We reverse the judgment and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

LifeCare operates a licensed skilled nursing facility that provides skilled nursing care for long-term residents and is subject to state and federal regulations. On January 16, 1999, Quartermaine, Norman's 87-year-old mother, was admitted as a resident of LifeCare's nursing facility. LifeCare noted Quartermaine suffered from dementia, myasthenia gravis (a progressive muscle-weakening condition), diverticulosis, angina, and chronic back pain.[1] On January 18 LifeCare conducted a fall risk assessment for Quartermaine and assigned her a score of 11, which reflected a moderate risk for falls. Although LifeCare's assessment noted Quartermaine had "episodes of sudden weakness, dizziness, [and] unsteadiness with position change," it did not state that Quartermaine had fallen within the past six months.[2] Based on its assessment, LifeCare's initial care plan for Quartermaine provided for a call bell within her reach and a low-bed position. Her physician also ordered that her bed's side rails be kept in the "up" position.

---

[1] It also noted that her prescribed medications included Haldol, Mestinon, Roxanol, and Adalat.

[2] Although LifeCare noted Quartermaine had bruises on her hands, arms and legs, it did not inquire regarding their cause, which apparently was a fall she suffered two weeks before her admission to LifeCare.

At 4:00 p.m. on January 19, because of Quartermaine's attempts to climb out of her bed, LifeCare updated her care plan to provide her with a personal alarm that was clipped to her clothing and would alert the staff if she left her bed. At 10:15 p.m. that day, LifeCare noted episodes of Quartermaine removing her personal alarm and attempting to climb out of bed.

On January 24 LifeCare noted Quartermaine suffered confusion from visual hallucinations and had poor safety awareness. At 11:45 p.m. that day, she apparently fell and was found sitting on the floor next to her bed with its side rail down. Her physician was notified of this incident.

On January 25 a LifeCare interdisciplinary team discussed Quartermaine's circumstances and updated her care plan to provide her with a sensor pad alarm and to encourage her to ask for assistance in lying down. Another fall risk assessment was conducted and LifeCare assigned her a score of 16, which reflected a high risk for falls. However, it did not mention that Quartermaine had fallen within the past six months. At 12:00 p.m. that day, Quartermaine was found kneeling next to her wheelchair, stating, "I want to [lie] down." LifeCare called Quartermaine's physician and daughter to inform them of her fall. On January 26 LifeCare noted Quartermaine suffered confusion from hallucinations.

At 8:00 a.m. on January 28, Quartermaine was found lying on the floor near her bed, apparently because of a fall. Her bed alarm had not sounded. At 11:00 a.m. that day, she was found sitting on the floor near her bed with the alarm sounding. She sustained two skin tears on a finger. Her physician was notified of the incidents. LifeCare assessed Quartermaine's circumstances and noted she had a previous fall or falls, had an unsteady gait, had declined in her functional status, and required "physical restraint or other supportive device to assist in preventing falls." Another fall risk assessment was conducted and LifeCare assigned her a score of 24, which reflected a high risk for falls. On February 3 another fall assessment was conducted with the same fall risk conclusion. LifeCare's weekly summary on February 6 noted that Quartermaine continued to suffer from confusion, disorientation and hallucinations. Despite LifeCare's knowledge regarding Quartermaine's condition and prior incidents, it decided not to seek an order from her physician that she be provided with restraints.

At 3:40 a.m. on February 8, Quartermaine apparently fell from her bed and was found lying on the floor nearby. She sustained a contusion, a broken nose, a fractured wrist and thumb, the loss of two teeth, and other facial and hand injuries. LifeCare's notes show that at 4:00 p.m. that day Quartermaine's family requested a roll belt to restrain her while she was bed and a

back-release seat belt while she was in a wheelchair. LifeCare requested and received an order from her physician to use those restraints. Quartermaine suffered no further falls until her discharge from LifeCare on or about June 2.

On or about June 4 Quartermaine died while residing in another skilled nursing facility.[3] DHS investigated LifeCare's care of Quartermaine and concluded it violated certain regulations, including California Code of Regulations, title 22, section 72311, subdivision (a)(1)(A), (C), and (3)(B). Although DHS initially issued a "Class A" citation against LifeCare, LifeCare subsequently filed an action challenging that citation and settled that action by agreeing to the issuance by DHS of a "Class B" citation.

Norman filed an action against LifeCare and other defendants alleging causes of action for elder abuse and wrongful death.[4] Her third amended complaint alleged that LifeCare's elder abuse of Quartermaine resulted in her injuries and subsequent death. In addition to ordinary damages, Norman sought heightened remedies for both causes of action under Welfare and Institutions Code section 15657.[5] The jury returned a nine-to-three special verdict in favor of LifeCare. The jury answered "no" to special verdict question no. 1: "Did [LifeCare] engage in conduct [that] resulted in Dorothy Quartermaine being subjected to neglect or physical abuse?" The jury also answered "no" to special verdict question no. 2: "Did [LifeCare] deprive Dorothy Quartermaine of goods or services that were necessary to avoid physical harm or mental suffering?" As instructed, the jury did not answer the remaining special verdict questions regarding causation, damages, or section 15657 issues. The trial court entered judgment in favor of LifeCare in accordance with the jury's special verdict. The trial court denied Norman's motions for judgment notwithstanding the verdict and new trial.

Norman timely filed a notice of appeal.[6]

---

[3]At trial Norman's medical expert testified that Quartermaine's February 8 injuries were a substantial factor in causing her death. LifeCare's medical expert testified that those injuries were not a substantial factor in causing her death.

[4]Norman also initially alleged causes of action for fraud and deceit and for medical malpractice, but subsequently withdrew those causes of action, respectively, before and during trial.

[5]All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[6]In addition to briefing by the parties, we have considered amicus curiae briefing filed by the California Association of Health Facilities in support of respondents (and appellant's response thereto), and by California Advocates for Nursing Home Reform, Inc., in support of appellant.

DISCUSSION

I

*Elder Abuse Generally*

■ The Elder Abuse and Dependent Adult Civil Protection Act (§ 15600 et seq., hereinafter the Act) provides for both criminal and private civil enforcement of elder abuse laws. (*Delaney v. Baker* (1999) 20 Cal.4th 23, 33 [82 Cal.Rptr.2d 610, 971 P.2d 986].) "[O]ne of the major objectives of [the Act is] the protection of residents of nursing homes and other health care facilities." (*Id.* at p. 37.) Section 15610.07 defines "abuse of an elder" as *either*: "(a) Physical abuse, *neglect*, financial abuse, abandonment, isolation, abduction, or other treatment with resulting physical harm or pain or mental suffering[; or]" "(b) The *deprivation* by a care custodian *of goods or services that are necessary to avoid physical harm or suffering*."[7] (Italics added.) The Act's definition of "neglect" includes: "The negligent failure of any person having the care or custody of an elder . . . to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) The Act's definition of "goods and services necessary to avoid physical harm or mental suffering" includes: "Protection from health and safety hazards." (§ 15610.35, subd. (e).)

In 1991 the Act was amended to allow in certain circumstances heightened remedies not otherwise recoverable in an ordinary private, civil action for elder abuse. (*ARA Living Centers-Pacific, Inc. v. Superior Court* (1993) 18 Cal.App.4th 1556, 1563-1564 [23 Cal.Rptr.2d 224]; *Delaney v. Baker*, *supra*, 20 Cal.4th at pp. 33-36.) Those heightened remedies include awards of reasonable attorney fees and costs and limited damages for a decedent's pain and suffering.[8] (§ 15657; *ARA Living Centers-Pacific, Inc.*, *supra*, at p. 1564; *Delaney*, *supra*, at p. 33.)

---

[7]At trial LifeCare and Norman stipulated that Quartermaine was an elder and LifeCare was responsible for the care and custody of Quartermaine.

[8]Section 15657 provides: "Where it is proven by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, neglect as defined in Section 15610.57, or financial abuse as defined in Section 15610.30, and that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse, in addition to all other remedies otherwise provided by law: [¶] (a) The court shall award to the plaintiff reasonable attorney's fees and costs. The term 'costs' includes, but is not limited to, reasonable fees for the services of a conservator, if any, devoted to the litigation of a claim brought under this article. [¶] (b) The limitations imposed by Section 337.34 of the Code of

## II

*The Trial Court Prejudicially Erred by Refusing Norman's Request for an Instruction with BAJI No. 3.45 on Negligence Per Se*

Norman contends the trial court prejudicially erred by refusing her request for a modified BAJI No. 3.45 instruction on negligence per se.

### A

In addition to the standard instructions on elder abuse (BAJI No. 7.40 et seq.), Norman requested the following modified BAJI No. 3.45 instruction on negligence per se: "If you find that a party to this action violated California Code of Regulations, Title 22, [Section] 72311[, subdivision] (a)(1)(A)[,] (C) & (3)(B) [(]the regulations just read to you and that any such violation was a cause of injury to another[)], you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he or she did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, the defendants must prove by a preponderance of the evidence that they were faced with circumstances which prevented compliance or justified noncompliance with the regulations." LifeCare opposed Norman's requested instruction. The trial court perceived possible jury confusion resulting from a negligence per se instruction because of the different standards of proof in elder abuse causes of action: "[T]he problem I'm struggling with . . . [i]s that you do have a two-tiered level [of standards of proof in elder abuse causes of action]. You need to show neglect and that level and all the conduct that goes to it is based upon preponderance of the evidence. [¶] The second level is the recklessness, oppression, fraud, malice. [¶] . . . [¶] That has a whole different standard, clear and convincing evidence." The trial court also questioned whether a negligence per se instruction would be appropriate under Evidence Code section 669, which provides: "(a) The failure of a person to exercise due care is presumed if: [¶] (1) He [or she] violated a statute, ordinance, or regulation of a public entity; [¶] (2) The violation proximately caused death or injury to person or property; [¶] (3) The death or injury resulted from an occurrence of the nature which the

---

Civil Procedure on the damages recoverable shall not apply. However, the damages recovered shall not exceed the damages permitted to be recovered pursuant to subdivision (b) of Section 3333.2 of the Civil Code. [¶] (c) The standards set forth in subdivision (b) of Section 3294 of the Civil Code regarding the imposition of punitive damages on an employer based upon the acts of an employee shall be satisfied before any damages or attorney's fees permitted under this section may be imposed against an employer."

statute, ordinance, or regulation was designed to prevent; and [¶] (4) The person suffering the death or the injury to his [or her] person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted. [¶] "(b) This presumption may be rebutted by proof that: [¶] (1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law . . . ."

The trial court noted that the first two elements of Evidence Code section 669 were questions of fact for the jury to decide and the last two elements were questions of law for the court to decide. It conceded the last two elements of Evidence Code section 669 were satisfied, stating: "I'll give you Elements 3 and 4, that [the cited regulations] were designed to prevent injury and death and that Ms. Quartermaine is part of the class that they were attempting to protect under the regulations." However, it expressed its concern that those regulations do not create a private cause of action. It also expressed concern that the cited regulations impose a duty on nursing care facilities to only *substantially* comply with those regulations, and stated:

"[W]hy would I give [a] Negligence Per Se [instruction] under the Welfare [and] Institutions Code when we already have all of it outlined under the elder abuse [BAJI No. 7.40 et seq. instructions] with regard to what [Life-Care is] supposed to do, how [LifeCare is] supposed to do it, what [LifeCare is] not supposed to do and what burden[s] of proof[] [LifeCare is] supposed to do it under, whether it be [under] penalty of perjury or whether it be clear and convincing evidence. [¶] And under [section] 15600, there is no shifting of [the] burden of proof, when under Negligence Per Se that adds an additional element of the shifting burden of proof, also adds an element of presumption of negligence that's not contained under Welfare [and] Institutions Code Section 15600 et seq. [¶] . . . [¶]

"[T]he problem is, I let in—and I let you evidence all that with regard to the DHS reports and Mrs. Quartermaine and the fact that the [regulations] were violated. What we did is we stop it at that point so that the jury would not be confused with regard to the fact that [LifeCare was] cited and if [it was] cited, then it would mean that [LifeCare was] negligent. [¶] [T]hat's exactly what you're asking me to do with the Negligence Per Se statute now."

Norman replied: "But that's what Negligence Per Se is. In other words, somebody's driving drunk and they violate the statute, . . . that goes . . .

not [to] enforcement or their arrest or any of that, but the fact they violated the statute creates the presumption. That's all. [¶] That's all we're asking for. And, yeah, there's been evidence that [LifeCare] violated the [regulations]. And . . . therefore, the presumption should apply." The trial court refused Norman's request for the modified BAJI No. 3.45 instruction on negligence per se and gave the standard BAJI No. 7.40 et seq. elder abuse instructions.

In denying Norman's motions for new trial and judgment notwithstanding the verdict, the trial court stated: "With regard to the negligence per se, I think there's probably room for argument both ways. You know, maybe it should have been given, as well as maybe it shouldn't have been given. But the real issue is was there any prejudice? And the [regulation] titles and sections were evidenced during the course of the trial and BAJI No. 7.40 which laid out everything under elder abuse was there and certainly left room for counsel to argue those [regulations] in conjunction with the standards as articulated by [BAJI No.] 7.40. [¶] So the argument was there that [LifeCare] violated those [regulations]. So I don't think that there was prejudice in not giving the BAJI [No.] 3.45 instructions as well as the fact that the professional negligence cause of action . . . was dismissed."

### B

■ "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her that] is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].) "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable [because] the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" (*Christian v. Bolls* (1970) 7 Cal.App.3d 408, 415-416 [86 Cal.Rptr. 545].) "Although a party is entitled to instructions on his [or her] theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give instructions [that] are not correct statements of the law or are incomplete or misleading [citation]." (*Levy-Zentner Co. v. Southern Pac. Transportation Co.* (1977) 74 Cal.App.3d 762, 782 [142 Cal.Rptr. 1].)

### C

■ We conclude that substantial evidence supports instructing with Norman's modified BAJI No. 3.45 on her neglect theory of elder abuse and

the instruction is a correct statement of the law. The trial court therefore erred by refusing her request for that instruction.

One of Norman's theories of elder abuse was that LifeCare neglected Quartermaine, as that term is used in the Act. (§ 15610.07.) "Neglect" under the Act includes: "The *negligent* failure of any person having the care or custody of an elder . . . to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1), italics added.) In support of her neglect theory of elder abuse, Norman presented evidence that LifeCare violated certain DHS regulations that apply to licensed skilled nursing facilities, including LifeCare. Luis Velasquez, the DHS surveyor who investigated LifeCare's care of Quartermaine, testified he found on behalf of DHS that LifeCare had violated certain regulations, including California Code of Regulations, title 22, section 72311, subdivision (a)(1)(A), (C), and (3)(B), which provide:

"(a) Nursing service shall include, but not be limited to, the following:

"(1) Planning of patient care, which shall include at least the following: [¶] (A) Identification of care needs based upon an initial written and continuing assessment of the patient's needs with input, as necessary, from health professionals involved in the care of the patient. Initial assessments shall commence at the time of admission of the patient and be completed within seven days after admission. [¶] . . . [¶] (C) Reviewing, evaluating and updating of the patient care plan as necessary by the nursing staff and other professional personnel involved in the care of the patient at least quarterly, and more often if there is a change in the patient's condition. [¶] . . . [¶]

"(3) Notifying the attending physician promptly of: [¶] . . . [¶] (B) Any sudden and/or marked adverse change in signs, symptoms or behavior exhibited by a patient."

Velasquez testified: "In summary after the requisite review and the staff was interviewed, we found that [LifeCare's] care plan [for Quartermaine] was not updated or changed in order to meet [her] needs resulting in several falls and injuries."[9] He also testified that LifeCare did not notify Quartermaine's physician of her hallucinations and the change in her condition, as required by the regulations.

---

[9]The first finding in Velasquez's report stated: "Failure to ensure that a comprehensive continuing assessment of [Quartermaine's] mobility, medical, and psychological conditions was done and then utilized to review, evaluate and update as necessary the plan of care and to develop effective approaches. As a consequence, [Quartermaine] sustained four falls with the final fall resulting in multiple injuries and fractures." The second finding in his report stated: "Failure to provide an ongoing evaluation or assessment or reevaluation of

The California Code of Regulations title 22 regulations applicable to licensed skilled nursing facilities define those facilities' duties of care owed to their residents and therefore define duties of care applicable to elder abuse of those residents. (*Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 519-524 [95 Cal.Rptr.2d 336].) In *Conservatorship of Gregory*, the trial court's instructions on elder abuse incorporated title 22 regulations that "included numerous, specific examples of what constituted neglect in the treatment and care of nursing home patients."[10] (*Gregory;* at p. 521.) *Conservatorship of Gregory* stated: "[T]he statutory definition of neglect set forth in the first sentence of Welfare and Institutions Code section 15610.57 is substantially the same as the ordinary definition of neglect. . . . Contrary to defendants' characterization of the regulations as vague, the instructions formulated by the court provided concrete examples [that] amplified the instruction on elder abuse based on Welfare and Institutions Code section 15610.07. Accordingly, we reject defendants' claim the elder abuse instructions misled the jury and prejudiced their case." (*Gregory, supra,* at p. 521.) The *Gregory* court rejected the defendants' contention that the regulations had nothing to do with the Act, noting that the regulations were authorized by Health and Safety Code section 1275 and therefore "can be used to describe the care required under an *existing* statutory right of action for elder abuse." (*Gregory, supra,* 80 Cal.App.4th at pp. 522-523.) The court stated: "Like statutes, applicable regulations are a 'factor to be considered by the jury in determining the reasonableness of the conduct in question.' [Citations.]" (*Id.* at p. 523.) The court concluded the regulations "were designed to protect nursing home residents by defining the care that was due [them]" and therefore the trial court properly included those regulations in its instructions on elder abuse. (*Ibid.*)

In *Klein v. BIA Hotel Corp.* (1996) 41 Cal.App.4th 1133 [49 Cal.Rptr.2d 60], the plaintiffs' wrongful death action was based on the defendant's alleged negligence in caring for their mother in a residential hotel facility for the elderly. (*Id.* at p. 1135.) The complaint alleged "eight causes of action for negligence in the running of defendant's residential care facility, all of them based on defendant's alleged failure to comply with [title 22 of] the

[Quartermaine's] new onset of auditory and visual hallucinations, and communicating her change in behavior to the attending physician [on] a timely basis. As a consequence, [Quartermaine] continued attempting to get out of bed, and she self[-]transferred from a wheelchair to bed without assistance. This ultimately [led] to a fall on [February 8, 1999] with serious injuries."

[10]The trial court "described how '[p]atients of skilled nursing facilities shall be treated and cared for' by reading portions of state statutes, and state and federal regulations governing patients' rights and patient care in skilled nursing facilities. [Citations.]" (*Conservatorship of Gregory, supra,* 80 Cal.App.4th 514, 519.) The instructions included regulations applicable to skilled nursing facilities (e.g., Cal. Code Regs., tit. 22, §§ 72315, 72528). (*Gregory,* at p. 519.)

California Code of Regulations."[11] (*Klein,* at p. 1135.) "Plaintiffs allege these violations of the regulations were the proximate cause of their damages and further allege that under Evidence Code section 669, defendant is presumed to be negligent." (*Klein,* at p. 1137, fn. omitted.) The trial court granted the defendant's motion for summary judgment, concluding the defendant did not have a duty to exercise reasonable care to prevent the plaintiffs' mother from committing suicide by jumping off the roof of its five-story facility. (*Id.* at p. 1135.) On appeal, plaintiffs contended, inter alia, that the "defendant had a duty of care to [their mother] to *prevent* her death" based on the regulations that govern residential care facilities. (*Id.* at p. 1139.) *Klein* stated: "[Plaintiffs' mother] took her life at a facility where defendant was required by law to monitor, to some degree, her health and well-being, to inform certain persons of changes in her condition, and to determine whether the facility would be able to continue to care for her because of those changes. The obligations imposed on defendant were obviously designed to prevent [her] mental and physical problems from going unnoticed and untreated, so that harm to [her] could be avoided." (*Id.* at p. 1140.) It further stated: "[W]e focus on the fact that defendant had duties under the regulations which, if followed, *may* have prevented decedent's death. Decedent was a member of the class of persons designed to be protected by the regulations. Clearly, the regulations were designed to protect residents of residential care facilities for the elderly from, among other things, harm such as decedent experienced. Clearly[,] plaintiff[s'] loss resulted 'from an occurrence of the nature which the [regulations were] designed to prevent.' (Evid. Code, § 669.) By taking decedent as a resident at its care facility, defendant agreed, for her benefit, to abide by the regulations. Thus, defendant had the duty to exercise the care called for in those regulations." (*Klein, supra,* at p. 1141.) The court reversed the summary judgment, noting that on remand there could be resolution of the factual questions whether the defendant complied with the regulations and, if not, whether its breach of its duty of care was a substantial factor in causing the decedent's death. (*Id.* at p. 1142.)

*Galvez v. Frields* (2001) 88 Cal.App.4th 1410 [107 Cal.Rptr.2d 50] concluded the trial court erred by refusing the plaintiff's request for a BAJI No. 3.45 instruction on negligence per se based on the defendant's alleged violations of a regulation that requires clinicians to advise pregnant women

---

[11]"In their complaint, plaintiffs allege defendant violated provisions in the regulations by 'failing or refusing to sufficiently, adequately or frequently obtain or complete admission appraisals and reappraisals,' by 'failing or refusing to notify resident's physician or family of changes in resident's mental state.'" (*Klein v. BIA Hotel Corp., supra,* 41 Cal.App.4th at p. 1137.)

of the availability of the alpha-fetoprotein (AFP) test.[12] (*Galvez,* at pp. 1413-1414, 1422.) *Galvez* stated: "[T]he regulations at issue establish a standard of care. [Citation.] If properly instructed, the jury would have had the opportunity to find that [the defendant] breached the applicable standard of care by violating the regulation." (*Id.* at p. 1423.) It further stated: "The regulations at issue here properly established a standard of care, but the jury was not given the negligence per se instruction [that] would have permitted them to rely on the regulations for that purpose." (*Ibid.*) Therefore, the court implicitly concluded testimony by the plaintiff's expert on the regulation was not a sufficient substitute for a BAJI No. 3.45 instruction on negligence per se regarding the import of a violation of that regulation. (*Galvez,* at pp. 1423-1424.)

Based in part on the reasoning in the foregoing cases, we conclude the regulations in question impose on LifeCare duties of care, and a breach by LifeCare of those duties of care constitutes "[t]he *negligent* failure . . . to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1), italics added.) Accordingly, a violation by LifeCare of those regulations in caring for an elder constitutes elder abuse neglect under the Act. The issue is whether the alleged violation of those regulations required the trial court to instruct with a modified BAJI No. 3.45 instruction under Evidence Code section 669. ■ *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540 [208 Cal.Rptr. 874, 691 P.2d 630] discussed the statutory requirements for application of the doctrine of negligence per se: "Section 669 of the Evidence Code sets forth the doctrine commonly called negligence per se. It provides that negligence of a person is presumed if he violated a statute or regulation of a public entity, if the injury resulted from an occurrence that the regulation was designed to prevent, and if the person injured was within the class for whose protection the regulation was adopted. This presumption may be rebutted by proof that the violator did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law." (*Elsworth, supra,* at pp. 544-545, fn. omitted.)

■ In considering whether a BAJI No. 3.45 instruction on negligence per se should have been given as requested in the circumstances of this case,

---

[12]In *Galvez,* the trial court explained its reasoning for refusing to give BAJI No. 3.45: " 'Well, what's troubling me about this instruction is not only in this case but in other cases when negligence that's alleged is sought to be established as negligence per se. If that is the crux of the matter, then all you need is a statute and you don't need anything else. All you need is a statute.' . . . 'This instruction will be disallowed. I think it's confusing to the jury, unnecessary. There's ample oral evidence about the subject matter that you can argue, if you wish, but I'm not going to confuse the jury with telling them if the plaintiff fits into this statute, the ball game's over. I'm not going to give such an instruction.' " (*Galvez v. Frields, supra,* 88 Cal.App.4th at p. 1419.) Without an instruction on negligence per se, the jury found (by a nine-to-three vote) the defendant was not negligent. (*Ibid.*)

we first decide as questions of law under Evidence Code section 669 whether Quartermaine's injuries and/or death "resulted from an occurrence of the nature [that] the . . . regulation[s] [were] designed to prevent" and whether Quartermaine "was one of the class of persons for whose protection the . . . regulation[s] [were] adopted." (Evid. Code, § 669, subd. (a)(3), (4); *Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1306 [61 Cal.Rptr.2d 260]; *DiRosa v. Showa Denko K.K.* (1996) 44 Cal.App.4th 799, 805-806 [52 Cal.Rptr.2d 128].) California Code of Regulations, title 22, section 72311, subdivision (a)(1)(A) and (C) requires LifeCare to develop a care plan for each resident by initially assessing a new resident's care needs and updating that care plan if any change in the resident's condition occurs. California Code of Regulations, title 22, section 72311, subdivision (a)(3)(B) requires LifeCare to promptly notify the resident's attending physician if there is any "sudden and/or marked adverse change in signs, symptoms or behavior exhibited by [that resident]." It is clear those regulations were intended to protect the class of residents of licensed skilled nursing facilities. Because Quartermaine was a resident of LifeCare's· licensed skilled nursing facility, she was a member of the "class of persons for whose protection the . . . regulation[s] [were] adopted." (Evid. Code, § 669, subd. (a)(4).) Furthermore, the regulations clearly were intended to protect the health and safety of nursing home residents by requiring the initial development and updating of appropriate care plans for them and notification of their physicians if there is any change in their conditions. There could be no other substantive purpose for those regulations other than to protect the health and safety of nursing home residents. Protection of residents from the risk of falling and suffering injuries is included within the regulations' general purpose of protecting the residents' health and safety. Because substantial evidence shows Quartermaine suffered injuries from falling at LifeCare's facility, her injuries "resulted from an occurrence of the nature [that] the . . . regulation[s] [were] designed to prevent." (Evid. Code, § 669, subd. (a)(3).) Therefore, the two Evidence Code section 669 elements that are questions of law are satisfied in this case.

The other two Evidence Code section 669 elements are questions of fact for the jury to decide, and we must determine whether there is substantial evidence to support factual findings that LifeCare "violated a . . . regulation of a public entity" and "[t]he violation proximately caused death or injury to" Quartermaine. (Evid. Code, § 669, subd. (a)(1) & (2).) If there is insufficient evidence to support those possible findings, then an instruction on negligence per se is not warranted. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 572; *Christian v. Bolls, supra,* 7 Cal.App.3d at pp. 415-416.) As discussed *ante,* Velasquez testified he found on behalf of DHS that LifeCare had violated California Code of Regulations, title 22, section

72311, subdivision (a)(1)(A), (C), and (3)(B) in caring for Quartermaine. That testimony, without more, constitutes substantial evidence to support a finding that LifeCare violated a state regulation. (Evid. Code, § 669, subd. (a)(1).) On the second factual element, Velasquez testified he "found that [Quartermaine's] care plan was not updated or changed in order to meet [her] needs *resulting in* several falls and injuries." (Italics added.) (See fn. 8, *ante*.) Therefore, Velasquez in effect testified that LifeCare's regulatory violations were a substantial factor (or a proximate cause) of Quartermaine's injuries. Bernard Michlin, Norman's medical expert, also testified that the injuries Quartermaine suffered from her fall on February 8, 1999, were a substantial factor in bringing about her death. Therefore, there is substantial evidence to support a finding that LifeCare's alleged violations of the regulations in question "proximately caused death or injury to" Quartermaine. (Evid. Code, § 669, subd. (a)(2).) Because there is substantial evidence to support findings that both factual elements of negligence per se exist and we have concluded the two question-of-law elements of negligence per se are satisfied, the trial court erred by refusing Norman's request for an instruction with BAJI No. 3.45 on negligence per se. (Evid. Code, § 669; *Soule, supra*, at p. 572; *Christian, supra*, at pp. 415-416.)

Norman's dismissal of her medical malpractice cause of action did *not* preclude a negligence per se instruction on her remaining causes of action for elder abuse and wrongful death. As we discussed *ante*, her neglect theory of elder abuse involves the negligent failure to exercise that degree of care that a reasonable person in a like position would exercise. (§ 15610.57, subd. (a)(1).) Therefore, LifeCare's alleged *negligence* in caring for Quartermaine, an elder, is one of Norman's theories for finding LifeCare liable for elder abuse. The doctrine of negligence per se does *not* apply only to professional negligence causes of action. Rather, it generally can apply to any cause of action based on or involving negligence, including an elder abuse cause of action on a neglect theory. LifeCare does not cite any case that persuades us to conclude otherwise. Furthermore, Norman's objections to LifeCare's requested instructions on professional standards of care (BAJI No. 6.00 et seq.) did not preclude her from requesting a BAJI No. 3.45 instruction on negligence per se because that instruction is consistent with her elder abuse cause of action on a neglect theory.

D

We consider whether refusing Norman's request for a BAJI No. 3.45 instruction on negligence per se was prejudicial. ■ In a civil case an instructional error is prejudicial reversible error only if it is reasonably probable the appellant would have received a more favorable result in the

absence of the error. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 570; *Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th at p. 1313; *Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].) "This determination depends heavily on the particular nature of the error, and its *effect on the appellant's ability to place his or her full case before the jury.* Actual prejudice must be assessed in the context of the [entire] trial record[.]" (*Daum, supra,* at p. 1313, italics added.) *Daum* stated: "We evaluate instructional errors by considering (1) the state of the evidence, particularly conflicts on critical issues; (2) the effect of other instructions; (3) the effect of counsel's argument, particularly whether the respondent's arguments to the jury may have contributed to the misleading effect of the instructional error; (4) any indication by the jury that it was misled; and (5) the closeness of the verdict." (*Daum, supra,* at p. 1313, citing *Soule, supra,* at pp. 570-571, 580-581.)

 In cases involving similar circumstances, courts have held that the erroneous refusal to instruct with BAJI No. 3.45 on negligence per se was prejudicial error. In *Galvez v. Frields, supra,* 88 Cal.App.4th 1410, the court concluded the trial court erred by refusing the plaintiff's request for an instruction with BAJI No. 3.45 in his medical malpractice action. (*Galvez,* at pp. 1413, 1422.) The modified BAJI No. 3.45 instruction would have instructed the jury that if it found a regulation requiring advisement regarding AFP tests had been violated, then that violation would be presumed to constitute negligence and that presumption would be conclusive unless rebutted by the defendant.[13] (*Galvez,* at pp. 1418-1419.) In a nine-to-three verdict, the jury found the defendant was not negligent. (*Id.* at p. 1419.) *Galvez* concluded:

"It is clear from our review of the entire record that [the plaintiff] was not able to place his full case before the jury. . . . [T]he regulations at issue establish a standard of care. [Citation.] If properly instructed, the jury would have had the opportunity to find that [the defendant] breached the applicable standard of care by violating the regulation. The evidence would have

---

[13]The requested BAJI No. 3.45 instruction on negligence per se stated: " 'If you find that a party to this action violated Section 6527 of Title 17, of the California Code of Regulations, the regulation set forth in Exhibit Number 16 and that such violation was a cause of injury to another, you will find that such violation was negligence unless such party proves by a preponderance of the evidence that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. In order to sustain such burden of proof, such party must prove by a preponderance of the evidence that he was faced with circumstances [that] prevented compliance or justified noncompliance with the regulation.' " (*Galvez v. Frields, supra,* 88 Cal.App.4th at pp. 1418-1419.)

supported such a finding, but as we next explain, this jury was precluded from reaching that finding.

"A finding of medical negligence must be based on a finding that a physician breached a standard of care. The regulations at issue here properly established a standard of care, but the jury was not given the negligence per se instruction [that] would have permitted them to rely on the regulations for that purpose." (*Galvez v. Frields*, *supra*, 88 Cal.App.4th at p. 1423.)

Although there was testimony regarding the AFP regulations, the trial court instructed with BAJI No. 6.30 to the effect that the jury could rely only on the opinions of the expert witnesses in deciding the applicable standard of care. (*Galvez v. Frields*, *supra*, 88 Cal.App.4th at p. 1424.) *Galvez* concluded the jury "was precluded from basing its ruling on [the plaintiff's] valid theory that the AFP regulations established a standard of care [that the defendant] breached" and therefore "[t]he refusal to give the negligence per se instruction was irrefutably prejudicial to [the plaintiff's] presentation of his case." (*Ibid.*) Accordingly, the court reversed the judgment for the defendant and remanded the matter for a new trial. (*Ibid.*)

In *Daum v. SpineCare Medical Group, Inc.*, *supra*, 52 Cal.App.4th 1285, the court similarly concluded the trial court's instructional errors, including its refusal to instruct with BAJI No. 3.45 on negligence per se, were prejudicial error. (*Daum,* at pp. 1312-1318.) Considering the five factors cited *ante* in the context of the entire trial record, *Daum* concluded: "Instead of being able to try the case based on the [applicable] statutes and regulations . . . , the [plaintiffs] were forced to engage in a battle of experts over the duty of disclosure. The jury resolved this dispute based on erroneous instructions. . . . We recognize the causation issue presents a close question. The jury did not reach that question because of the instructional errors. The [plaintiffs] deserve a chance to present their case to a jury that is properly instructed on [the defendant's] duty of disclosure [i.e., care]."[14] (*Daum,* at p. 1318.) Because of the instructional errors, the court reversed the judgment.[15] (*Daum,* at p. 1319.)

Considering the five factors cited in *Daum* in light of the entire record in this case, we conclude the trial court's error in refusing to instruct with BAJI No. 3.45 on negligence per se was prejudicial error. First, the state of the

[14]As in *Galvez*, the prejudicial effect of the trial court's erroneous refusal to instruct with BAJI No. 3.45 on negligence per se was compounded by its instruction with BAJI No. 6.30. (*Daum v. SpineCare Medical Group, Inc.*, *supra*, 52 Cal.App.4th at pp. 1302-1304, 1316-1317.)

[15]In the circumstances of that case, the court concluded the "strong majority" 11-to-1 verdict did *not* show a lack of prejudice from the instructional errors. (*Daum v. SpineCare Medical Group, Inc.*, *supra*, 52 Cal.App.4th at p. 1318.)

evidence shows there was conflicting evidence on the critical issue of neglect under the elder abuse definition. Norman presented the testimony of Velasquez that LifeCare had violated the regulations in question in caring for Quartermaine. She also presented the testimony of medical expert Joyce Licata regarding the applicable standard of care and LifeCare's failure to meet that standard in caring for Quartermaine. In opposition, LifeCare presented the testimony of medical expert Roselle Zuffoletto regarding the applicable standard of care and LifeCare's compliance with that standard in caring for Quartermaine. In particular, Zuffoletto testified that she disagreed with Velasquez's conclusion that LifeCare had violated the regulations in question in caring for Quartermaine.[16] Based on the evidence in the record, we believe it is reasonably probable that a properly instructed jury would have found LifeCare violated the regulations in question in caring for Quartermaine.

Second, the jury instructions given by the trial court did not cure or minimize the prejudicial effect of omitting BAJI No. 3.45 on negligence per se. Although the trial court instructed with standard jury instructions on elder abuse (i.e., BAJI No. 7.40 et seq.), those instructions did *not* address the principle set forth in BAJI No. 3.45 that a regulatory violation is presumed to constitute negligence and that presumption will be conclusive unless the defendant rebuts it. Absent an express instruction on negligence per se, the instructions given the jury allowed it to either consider or disregard any regulatory violation by LifeCare in weighing all of the evidence on, and deciding whether LifeCare had committed neglect under, Norman's elder abuse cause of action. Without an instruction on negligence per se, it is reasonably probable the significance and weight attributed by the jury to the evidence showing LifeCare violated the regulations in question

[16]Zuffoletto testified that she did not agree with Velasquez's finding that LifeCare "failed to ensure that a comprehensive continuing assessment of [Quartermaine's] mobility, medical and psychosocial condition was done and then utilized to review, evaluate and update as necessary the plan of care and to develop effective approaches for Mrs. Quartermaine." She explained the basis for her disagreement with Velasquez: "Well, in review of the medical records, I'm not sure he considered all the information provided in the medical record, the fall risk assessment, the RAP module, [and] the IDT notes. The changes on the care plan were all there and very obviously in the medical record. I'm not sure he looked at all of that." That explanation for her disagreement with Velasquez is not a compelling basis for the jury to discard Velasquez's conclusion and adopt Zuffoletto's. Zuffoletto also disagreed with Velasquez's finding there was "a failure to provide an ongoing evaluation or assessment or reevaluation of [Quartermaine's] new onset of auditory or visual hallucinations in communicating her change in behavior to the attending physician [on] a timely basis." She explained the basis for her disagreement with Velasquez: "Well, . . . it wasn't a new onset. Hallucinations were well established before she was admitted to the facility. And they were identified on admission and medication ordered, care planned and medication discontinued. So it wasn't a new behavior for her." Again, that explanation for her disagreement with Velasquez is not a compelling basis for the jury to discard Velasquez's conclusion and adopt Zuffoletto's.

was substantially and unduly diminished, resulting in its special verdict finding that LifeCare did not commit neglect in caring for Quartermaine.

Third, it is reasonably probable counsel's arguments may have contributed to the misleading effect of omitting BAJI No. 3.45. Because the trial court refused to instruct with BAJI No. 3.45 on negligence per se, Norman's counsel was precluded from arguing to the jury that it is presumed Life-Care's alleged violation of the regulations conclusively proved it was negligent in caring for Quartermaine unless LifeCare carried its burden to rebut that presumption. As a result, Norman's counsel cited Velasquez's findings that LifeCare had violated the regulations, but did not, and could not, argue those regulatory violations were presumed to constitute negligence. Life-Care's counsel, in turn, did not have the burden to argue that presumption had been rebutted and was able to avoid any substantive argument on the alleged regulatory violations by LifeCare. Instead, LifeCare's counsel argued that its decisions regarding its assessment and care of Quartermaine were merely "judgment calls," possibly misleading the jury to conclude LifeCare's decisions in caring for Quartermaine, even if in violation of regulations, were within its wide discretion and therefore did not constitute neglect.

Fourth, the jury's notes and other conduct do not show it was misled or, for that matter, not misled by the omission of BAJI No. 3.45. Its notes to the trial court did not relate to the issues of neglect or the effect of regulatory violations it may have found LifeCare committed. Accordingly, this factor neither supports nor detracts from our conclusion that the instructional error was prejudicial.

Finally, the closeness of the jury's special verdict *strongly* supports our conclusion that it is reasonably probable Norman would have received a more favorable verdict had the BAJI No. 3.45 instruction been given. Special verdict question no. 1 asked: "Did [LifeCare] engage in conduct [that] resulted in Dorothy Quartermaine being subjected to neglect or physical abuse?" In a nine-to-three vote, the jury answered "no" to that question. That vote was the bare minimum allowed for a verdict on that question. In *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869 [148 Cal.Rptr. 355, 582 P.2d 946], the court stated: "Even if only one of the nine jurors who supported the verdict voted on this basis, the effect was prejudicial. Here, as in *Robinson* v. *Cable* [(1961) 55 Cal.2d 425, 428 [11 Cal.Rptr. 377, 359 P.2d 929]], '[t]he fact that only the bare number of jurors required to reach a verdict agreed upon the verdict for defendants lends further support to the probability that the erroneous instruction was the factor [that] tipped the scales in defendants' favor.' [Citation.]" (*Id.* at p. 877; see also

*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1166 [84 Cal.Rptr.2d 257] [nine-to-three special verdict supported court's conclusion that erroneous omission of instruction was prejudicial].) *Galvez v. Frields, supra,* 88 Cal.App.4th 1410, as discussed *ante,* also involved a nine-to-three jury verdict finding the defendant was not negligent, which bare minimum vote presumably provided support for *Galvez*'s conclusion that the trial court's erroneous omission of BAJI No. 3.45 was prejudicial. (*Galvez,* at pp. 1419, 1423-1424.)

We further conclude that the trial court's erroneous refusal to instruct with BAJI No. 3.45 on negligence per se naturally and probably affected Norman's ability to place her full case before the jury. (*Soule v. General Motors, Inc., supra,* 8 Cal.4th at p. 580; *Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th at p. 1313; *Galvez v. Frields, supra,* 88 Cal.App.4th at p. 1423.) By refusing an instruction on negligence per se, the trial court precluded Norman from arguing that LifeCare's alleged regulatory violations were presumed to constitute negligence and therefore neglect under her elder abuse cause of action. Accordingly, Norman's ability to place her *full* case before the jury was probably affected by the court's error.

Based on our consideration of the entire record, we conclude it is reasonably probable Norman would have received a more favorable verdict in the absence of the trial court's error in refusing to instruct with BAJI No. 3.45 on negligence per se. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *Soule v. General Motors Corp., supra,* 8 Cal.4th at p. 570; *Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th at p. 1313; *Pool v. City of Oakland, supra,* 42 Cal.3d at p. 1069.) It is reasonably probable the jury would have answered "yes" to special verdict question No. 1 and found that LifeCare engaged in conduct that resulted in Quartermaine being subjected to neglect.

III

*Norman's Remaining Contentions Are Moot*

Because we reverse the judgment on the ground of prejudicial instructional error, we need not address Norman's remaining contentions that the trial court erred by excluding: (1) evidence of DHS's records regarding LifeCare's violations of regulations in caring for other patients; and (2) part of DHS's records regarding LifeCare's violation of regulations in caring for Quartermaine. On remand and retrial of this matter, the trial court may make different rulings on those evidentiary issues.

DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. The appellant shall recover her costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

Respondents' petition for review by the Supreme Court was denied August 13, 2003.