[Civ. No. 9254. Third Dist. June 10, 1958.]

ELI DRAGASH, an Incompetent Person, etc., et al., Appellants, v. THE WESTERN PACIFIC RAILROAD COMPANY (a Corporation) et al., Respondents.

Thomas C. Perkins, Perkins & Carr and Kenneth B. Cayocca for Appellants.

Johnson, Davies & Greve and Fitzwilliam, Memering & McDonald for Respondents.

VAN DYKE, P. J.—Eli and Dorothy Dragash appeal from a judgment following a jury verdict in favor of defendants Western Pacific Railroad Company, a corporation, and Cal-Hi Beverage Company, a corporation, hereinafter called respectively Western and Cal-Hi. Eli Dragash, who was alleged to be incompetent by reason of injuries suffered in the accident out of which this action arose, was represented by his wife, Dorothy, as guardian ad litem. Dorothy Dragash was also a party plaintiff.

On April 30, 1955, at a point in Sacramento where Western's tracks running north and south cross "D" Street, an automobile in which Eli Dragash and Michael Pobar were riding came into collision with a train of Western. Cal-Hi was joined as a defendant upon the theory that it had illegally parked two trucks near the tracks in such a way as to further obscure an already obscured railroad crossing. Dragash sought to hold Western for negligent operation of its train and for negligent maintenance of its crossing.

Michael Pobar was killed, and Dragash, by reason of his injuries, had no recollection of events before, during or after the accident. He was unable to testify as to the cause of the collision. He alleged that he was driving the car and that Pobar was his passenger. These allegations were denied by Western and Cal-Hi who contended that Pobar was driving. The car belonged to Dragash. Which man was driving became a vital issue at the trial. Analysis of the alcoholic content of Pobar's blood made after his death showed that he was intoxicated. Respondents sought to establish that he was

the driver and thus to impute to Dragash the conduct of Pobar, which respondents claimed was the sole proximate cause of the accident or at least proximately contributed thereto. If Dragash was the driver of the car he was entitled to the benefit of the presumption that he was operating the car with due caution at the time of the collision. Early in the case this contest developed and one of the main contentions on appeal is based upon the acceptance and rejection of evidence tending to prove which man was the driver.

It appears that other than the train crew there were no available eyewitnesses to the collision. Early in the presentation of appellants' case, Arthur L. Green, a city patrolman, was called to the stand. He had been the first officer to arrive at the scene and he made a report of his findings which were incorporated into the police investigation file. Green did not have the official file while testifying and used no part of it to refresh his memory while on the stand. One Schiro, a police officer next called by appellant, had been put in charge of the investigation at the scene of the accident. He and another officer made certain physical measurements, the other officer writing the measurements down in the form of field notes. These notes were a part of the accident investigation file, and before testifying Schiro had refreshed his recollection of the measurements and distances observed as they appeared in the field notes. From them he had made a diagram and he had this diagram with him and used it while testifying. Western cross-examined Schiro about the contents of the entire file of which defense counsel had a copy. Objections that hearsay and unqualified opinion evidence was being introduced were overruled, and Schiro was ordered to bring in the entire file. This he did. After receiving evidence that the file constituted the whole of the accident investigation made by the police department of the city, the entire file was introduced in evidence, marked as an exhibit in the case, and read to the jury. Thereafter, when the cause was submitted to the jury, this exhibit found its way into the jury room. It was prejudicially erroneous for the court to receive the entire file into evidence. A large number of people in pursuit of their official duties had done investigative work related to various phases of the police investigation of the accident and each person had made a report to the police department. The accident investigation file which was received in evidence was made up of these various reports by the individuals who

had participated in the investigation. The file was not in any sense the work of one person and neither Officer Green nor Officer Schiro had personal knowledge of any of the contents of the investigation file except such parts as they had reported. It was contended at the trial, and has been contended on appeal, that the introduction of the file was justified by section 2047 of the Code of Civil Procedure which in material part reads as follows:

"A witness is allowed to refresh his memory respecting a fact, by anything written by himself, or under his direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. But in such case the writing must be produced, and may be seen by the adverse party, who may, if he choose, cross-examine the witness upon it, and may read it to the jury."

This section afforded no justification for the introduction of the file into evidence. ▮ It is settled law in California that section 2047 applies only to the conduct of a witness while on the stand, that it does not require him to produce a writing which he consulted prior to the time he testified, and that "production of notes for inspection may be compelled only where the witness uses them while on the stand and not where he refreshes his memory with them before being examined." (*People* v. *Gallardo*, 41 Cal.2d 57, 67 [257 P.2d 29].) ▮ Neither Green nor Schiro so conducted himself as to warrant the ordering of the file into the courtroom. Officer Schiro did testify that as a sergeant in the traffic department of the Sacramento Police Department the entire file came over his desk to be approved by him, yet he said he had no personal knowledge of any of the other reports and did not prepare them. Furthermore, section 2047 refers to a writing made by the witness himself or under his direction stating facts he personally knew to be correctly stated. Obviously, the section affords no foundation for the introduction of the hearsay statement of other investigators. As will be shown, the file introduced was replete with such objectionable statements. There being no foundation laid for the introduction of any part of the investigative file, we will now proceed to summarize its contents sufficiently to show the damaging effect it must have had upon the appellants' case in the trial court.

The reports which made up the file were replete with

hearsay statements as to conversations had with various people, some of whom were witnesses and some of whom were not. One officer's report stated that the engineer had said to him the train was going north at 15 miles per hour; that as it approached "D" Street he saw the reflection of headlights from a vehicle coming east on "D"; that he was then 40 feet back from the intersection and the car was 150 feet west of the crossing, coming very fast at a speed of 40 to 50 miles per hour; that when the engine was 10 feet south of the intersection the car was 50 feet west; that the headlights were on; that the bell was ringing; that he sounded the horn, but did not have time to apply the brakes. The officer stated that the rest of the train crew corroborated the statements of the engineer. The file contained a report that an officer had been told the left rear tire of the automobile left a mark 19 feet 8 inches north of the south curb, and 4 feet 7 inches west of the west rail lines; that there had been no skid prior to the accident. The file contained a letter to the chief of police by the district attorney of the county, stating that after a review of the file, he had concluded there was insufficient evidence upon which to base a felony complaint against Dragash. Another officer reported a conversation with one Betty Jo Barrick, who told him she last saw Dragash two days before the accident and could not remember when she last saw Pobar; that she later changed her story, and that he concluded "she was lying throughout my entire discussion, because she became very nervous and upset when I directly accused her of seeing Dragash on the evening of the accident. She kept repeating that she had not seen him. She was very visibly moved when I also accused her of the fact that perhaps Dragash and Pobar were on their way out to see her." Another officer reported an interview with the same witness, and he said at that time the witness stated she had seen Dragash and Pobar drive by the place where she worked, just before the accident; that she was almost positive that Pobar was driving because she definitely recognized Dragash "giving her the finger." The file contained another report of a further interview with the same witness. She was then reported as saying that she was almost sure that the occurrences she had previously related had happened on the day before the accident. Later in the interview she was said to have stated that what she had told the officer the first time was right and that she was not going to say any more to anyone for fear she might get embarrassingly in-

volved; that she had said Dragash's wife had called her and asked her if she had seen Dragash that day and that she had denied to her that she had. The report contained the officer's conclusion "that someone had gotten to her and perhaps told her to deviate from her original story." Several of the investigating officers in their reports gave it as their opinion that the automobile was being driven by Michael Pobar. One report contained an assertion that the traffic control at the crossing was functioning at the time of the accident; another report stated a conversation with a witness who had told the officer that he had seen the Dragash car going north on 16th Street at 70 miles an hour with a police car chasing it; that the police car turned into "D" and within a few seconds he heard the crash of the collision; that the siren of the police car was still sounding. Enough has been said to demonstrate the damaging effect of the receipt of the investigation file in evidence. On what the parties both refer to in their briefs as the vital issue as to who was driving the car much hearsay testimony and many unqualified opinions were introduced to the effect that Pobar was the driver of the car. This went along with the evidence that Pobar had been intoxicated at the time. We think the foregoing summary demonstrates that appellants suffered prejudice to their entire case through the receipt in evidence of the file. On the vital issue of who was driving the car the jury must have been powerfully persuaded against appellants' theory of their case.

Appellants assign other errors, but in view of the fact that a new trial must be ordered it is unnecessary to discuss them all. Some will be noticed.

■ Appellants assign error in that the court excluded proposed testimony of an expert witness as to which of the two men was driving the Dragash car. Appellants assert that the trial court ruled this was a question of ultimate fact and not a proper subject for expert testimony and that the court so instructed the jury. The record bears out these statements. After excluding the evidence the court turned to the jury and said: "I think that I should here instruct the jury somewhat upon his point. The position of the Court is that this question of who was driving this automobile at the time of the accident is a question which is solely in the determination of the jury. In other words, you ladies and gentlemen are to determine that fact from all the evidence in the case. . . . that particular inquiry, to-wit, who was

driving the car at that time, is not the proper sphere for what we call 'expert testimony'. Therefore the Court is not allowing anyone to give his or her opinion as to who was driving the car. Now the difference between an opinion and an actual fact, I think perhaps you all know. In general, opinion may only be given by experts. Mr. Green [the witness] is an expert in his field, but I am holding this as not a field for the necessity of expert— In other words, it is a matter for you ladies and gentlemen of the jury to determine from all the evidence in the case.'' It appears that the expert was employed by the State Bureau of Criminal Identification and Investigation. He testified that he had examined the wrecked vehicle, had examined the reports of police officers as reflected in the investigation file that had been received in evidence at that time as to the position of the bodies in the car, and had examined the autopsy surgeon's reports as to the marks upon the body of Pobar, and the surgeon's expressed opinion that absence of chest bruising led him to believe Pobar was not driving the car. The witness stated that in his examination of the vehicle he had observed other details which indicated the identity of the driver. He stated he had an opinion on the matter, but he was prevented by the court from expressing it. It is unnecessary to evaluate the qualifications of the witness to express an opinion upon the subject for they may not be the same at another trial. It is enough to point out that the question of who was driving the car could be the subject of expert testimony by a qualified witness and that it was error to hold that the issue was not one which could be properly the subject of expert opinion. Respondents argue that in qualifying his witness, counsel for appellants used some of the material that was in the police report. Inasmuch as the court had, over his objection, received the entire file in evidence in which these matters appear, it was competent for counsel for appellants to use the evidence thus thrust upon him in laying the foundation for the expert's opinion. All of the documents referred to had been received in evidence for all purposes.

 Appellants complain of error in certain instructions given by the trial court on the force and effect of the orders of the Public Utilities Commission with respect to safeguards to be maintained at crossings such as the one here involved. The trial court instructed the jury as follows: That the Public Utilities Commission had been given exclusive power

to determine and prescribe protective measures to be taken at each crossing of a public highway by a railroad; that presumably the commission had performed its duties and presumably had exercised its exclusive power and had determined the protection required at "D" Street; that there was also a presumption that Western had performed its duty by installing such protective devices and appliances as had been prescribed by the commission; that Western had not been required by the commission to install any automatic signaling device or supply a flagman; that Western was not required by statutory provisions to install any automatic signaling device or supply a flagman; that it was the duty of Western to exercise reasonable care in warning travelers on a public street of its railroad crossings by the installation of whatever warning devices were reasonably necessary under the circumstances; that whether or not Western's compliance with any regulations issued by the commission amounted to reasonable care was a question for the jury; that if from consideration of all the facts and circumstances the jury found that a reasonably prudent person in the position of Western would have furnished an automatic warning system and Western had not in the exercise of ordinary care furnished such a warning device then it had been guilty of negligence. Appellants had requested an instruction advising the jury that the requirements of the commission with respect to warning devices constituted a minimum measure of care. This request the court denied. ██ It is stated in *Pennington* v. *Southern Pac. Co.,* 146 Cal.App.2d 605, 613 [304 P.2d 22]:

". . . It is well settled that such statutory regulations constitute only the minimum measure of care required by the railroad, and it is usually a matter for the jury to determine whether something more than the minimum was required under the evidence in the case." (Citing *Peri* v. *Los Angeles Junction Ry. Co.,* 22 Cal.2d 111 [137 P.2d 441], and other cases.)

██ A railroad company is not necessarily free from negligence, even though it may have literally complied with safety statutes or rules. The circumstances may require it to do more. (*Peri* v. *Los Angeles Junction Ry. Co.,* 22 Cal.2d 111, 126 [137 P.2d 441].) ██ In view of the recital of presumptions in favor of the railroad we think the jury ought to have been told that the regulations referred to constituted a minimum measure of care and that something more might

be required if in their judgment more was necessary in order to constitute reasonable conduct by Western. Without such an instruction, the jury probably received the impression that Western was free from fault notwithstanding the general instruction that the jury could find otherwise.

■ Appellants contend that the court erred in refusing to admit proposed testimony as to prior accidents at the same crossing and. to admit testimony that on one occasion the city of Sacramento, through its traffic department, had requested the railroad to install added safeguards at the "D" Street crossing. ■ Speaking generally, evidence of prior accidents which occurred under substantially the same general circumstances as the accident in question and which were not too remote in time is admissible to prove the existence of a dangerous condition and notice thereof to the defendant. (*Jaehne* v. *Pacific Tel. & Tel. Co.*, 105 Cal.App.2d 683, 689 [234 P.2d 165] ; *Gilbert* v. *Pessin Grocery Co.*, 132 Cal.App.2d 212 [282 P.2d 148] ; *Magnuson* v. *City of Stockton*, 116 Cal. App. 532, 535 [3 P.2d 30].) ■ Again speaking generally, it is not necessary that the prior accidents be shown to have occurred in precisely the same manner, but it is sufficient if a foundation be laid that they occurred under substantially similar circumstances. (*Gilbert* v. *Pessin Grocery Co., supra.*)

■ The parties are not in disagreement as to the general principles above stated. The objections made and sustained on behalf of Western were based upon the proposition that the requirements of these rules had not been met. Whether or not the test has been met in any case is primarily a question for the trial court to determine. There was testimony that between January 1, 1949, and April 30, 1955, there had been seven train-car collisions at the "D" Street crossing involving northbound trains, and that six of these involved eastbound vehicles. Only three of these, however, occurred at night-when the streets were dark, as was the situation here. Mr. Jackson Faustman, who had for long been city traffic manager of Sacramento, who had studied this crossing in his official capacity and gathered data concerning prior accidents, was asked if he had recommended the installation of an electric blinking signal. This testimony was refused admission by the court, as was the offered proof of the prior accidents mentioned. The record presented is confused as to the issue presented by this assignment of error. The proposed testimony of Mr. Faustman as to Western having had from him notice of his conclusions as to the need of an

automatic signal was admissible for that purpose had it been prefaced by proof of a dangerous condition in fact. But there had been no satisfactory proof of this and there were no clear-cut offers of proof. From the whole record touching this issue we think error has not been shown. We think nothing would be gained by a more detailed discussion. The situation is not likely to be the same on a retrial of the cause.

In view of the necessity of ordering a retrial, we think it would be profitless to discuss any of the other assignments of error made by the appellants.

For the reasons given, the judgment appealed from is reversed.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied July 7, 1958, and the petition of respondents, The Western Pacific Railroad Co. and Cal-Hi Beverage Co., for a hearing by the Supreme Court was denied August 7, 1958. Schauer, J., and Spence, J., were of the opinion that the petition should be granted.