Filed 6/5/13

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| SAMUEL NEVARREZ, | B235372 |
| Plaintiff and Respondent, | (Los Angeles Country Super. Ct. No. GC045033) |
| v. | |
| SAN MARINO SKILLED NURSING AND WELLNESS CENTRE et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles Country, C. Edward Simpson, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Niddrie, Fish & Addams and Michael H. Fish, for Defendant and Appellant San Marino Skilled Nursing and Wellness Centre, LLP.

Wilson Getty, William C. Wilson and Mary P. Miller; Boudreau Williams and Jon R. Williams, for Defendant and Appellant Country Villa Service Corp.

Moran Law, Michael F. Moran and Lisa Trinh Flint; Esner, Chang & Boyer, Stuart B. Esner, Andrew N. Chang and Holly N. Boyer, for Plaintiff and Respondent.

_____

San Marino Skilled Nursing and Wellness Centre, LLP (San Marino) and Country Villa Service Corp. (Country Villa) appeal from a judgment after a jury verdict in favor of Samuel Nevarrez[1] on theories of negligence, elder abuse based on reckless neglect (Welf. & Inst. Code, § 15657), and violation of the Patient's Bill of Rights (Health & Saf. Code, § 1430, subd. (b); Cal. Code Regs., tit. 22 § 752527). We find no error in the trial court's rejection of appellants' jury instruction on clear and convincing evidence and in its refusal to instruct the jury with state regulations on the use of restraints in nursing homes. However, we also conclude the court abused its discretion in admitting into evidence a class A citation and a statement of deficiencies issued by the state Department of Public Health (DPH) against San Marino.[2] Because the erroneous admission of the citation prejudiced the jury verdict on negligence and elder abuse, we reverse that portion of the verdict and the related award of damages. The evidentiary error did not affect the jury verdict on the Patient's Bill of Rights, and we affirm that portion of the verdict. But we reverse the civil penalties, which exceed the amount authorized by Health and Safety Code section 1430, subdivision (b). We also reverse the award of attorney fees and remand the case for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL SUMMARY

Country Villa operates nursing homes in California, including San Marino, a licensed nursing home. Country Villa and San Marino have a management contract for operation of the nursing home.

Nevarrez was 79 years old when he was admitted to San Marino for rehabilitation on March 13, 2009. He was alert, but had difficulty standing and walking and was at a

---

[1] Samuel Nevarrez died during the pendency of this appeal, and his wife Susan Schroeder Nevarrez was substituted as a party. References to Nevarrez are to Samuel Nevarrez.

[2] The class A citation and the statement of deficiencies were admitted as exhibits 1 and 2. We refer to these exhibits jointly as the citation.

high risk of falling. Between March 20 and April 24, Nevarrez fell nine times while at the nursing home. His falls usually occurred when he tried to get out of bed and go to the bathroom.

After the first fall, Nevarrez was assessed as having "[p]oor safety awareness/judgment," "[u]nsteady/poor gait," "attempt[ing] to function beyond ability," and "climb[ing] out of bed/chair." The recommended measures were "[b]ed in lowest position," "[t]oileting program" (which required assisting Nevarrez with going to the bathroom every two hours or as needed), and "drug regimen review."

Nevarrez fell a second time on April 4. He then was additionally assessed as being "forgetful," "impulsive," and poor at utilizing a safety device. It was recommended that his walker be kept within reach. After his third fall, on April 10, a lap belt "self-release" and a bed alarm were added. Two days later, Nevarrez fell twice on the same day. A bedside commode with a urinal was added, as well as a tab alarm in bed. Since Nevarrez had lost his balance trying to unzip his pants, it was suggested the family provide pants with a Velcro closure.

On April 19, Nevarrez fell for the sixth time. Padded pants were recommended, but he refused to wear them. It was noted he was "very adamant with transferring and ambulating without assistance." The bedside commode was discontinued because Nevarrez refused to use it. After the seventh fall, on April 21, it was noted Nevarrez was confused. A wheelchair alarm was added. He was to be monitored visually around the clock, but his room was not visible from the nurses' station. Nevarrez reported he fell again on April 23. The existing interventions were continued.

At about 1 a.m. on April 24, nurse De La Victoria and head nurse Cabral heard Nevarrez's bed alarm sound. By the time the nurses reached his room two minutes later, Nevarrez already was using the toilet. While nurse De La Victoria was shutting off the alarm, and head nurse Cabral stood in the doorway, Nevarrez lost his balance, hit his head on the wall, and fell. After this fall, he had to undergo brain surgery for a subdural hematoma, and later suffered a stroke. He was readmitted to San Marino between July and September 2009, and fell twice during his second stay at the facility.

3

In April 2010, Nevarrez filed a complaint alleging elder abuse under Welfare and Institutions Code section 15600 et seq., negligence, violation of the Patient's Bill of Rights (Health & Saf. Code, § 1430, subd. (b)), willful misconduct, and violation of Penal Code section 368.

The case went to trial on the first three causes of action, and in March 2011, the jury returned a special verdict. It found six violations of the Patient's Bill of Rights based on inadequate staffing and eight violations based on the failure to provide Nevarrez with material information. The jury found Nevarrez was not subjected to physical or mental abuse. On the negligence cause of action, the jury found San Marino and Country Villa each 40 percent negligent and Nevarrez 20 percent comparatively negligent. On the elder abuse cause of action, the jury found, by clear and convincing evidence, that Nevarrez's injuries were the result of reckless neglect, but it did not find fraud, malice or oppression. The jury awarded Nevarrez $1,191,007.90 for past medical expenses, $200,000 for future medical expenses, and $3,000,000 in general damages.

Several post-verdict motions were filed. In April 2011, the court awarded Nevarrez $7,000 as civil penalties ($500 for each of the 14 violations of the Patient's Bill of Rights) and $952,142.50 in attorney fees. The court denied appellants' motions to reduce the non-economic damages to the $250,000 cap under the Medical Injury Compensation Reform Act (Civ. Code, § 3333.2) and to reduce the economic damages to amounts actually paid. After judgment was entered in May 2011, appellants moved for a new trial and judgment notwithstanding the verdict. The court denied these motions at a hearing in July 2011, but no minute order was filed.

This timely appeal followed. Appellants have joined in each other's briefs.

## DISCUSSION

### I

A party is entitled to request that the jury be instructed correctly on any of the party's theories of the case that is supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) An erroneous refusal to instruct the

4

jury is reversible if it is probable that the error prejudicially affected the verdict. (*Id.* at p. 580.)

A. *Clear and Convincing Evidence Instruction*

The trial court instructed the jury with CACI No. 201 that "[c]ertain facts must be proved by clear and convincing evidence which is a higher burden of proof. This means that the party must persuade you that it is highly probable that the fact is true." The court refused appellants' proposed instruction, which read: "Clear and convincing evidence requires a finding of high probability that the evidence be so clear as to leave no substantial doubt; sufficiently strong as to command the unhesitating assent of every reasonable mind." Appellants argue the trial court's refusal to give their proposed instruction was prejudicial error requiring reversal of the elder abuse verdict, to which the higher burden of proof applied. We disagree.

Specifically, appellants contend the phrase "highly probable that the fact is true" in CACI No. 201 is misleading and unnecessarily limited without the additional language they proposed. The additional language was derived from *In re Angelia P.* (1981) 28 Cal.3d 908, where the California Supreme Court explained: "'Clear and convincing' evidence requires a finding of high probability. This standard is not new. We described such a test, 80 years ago, as requiring that the evidence be "'*so clear as to leave no substantial doubt*'; '*sufficiently strong to command the unhesitating assent of every reasonable mind.*'" [Citation.] It retains validity today." (*Id.* at p. 919, italics added.) Appellants argue the trial court was required to instruct the jury with the full description of the clear and convincing evidence standard set out in *In re Angelia P.*

Courts have rejected similar arguments directed at BAJI No. 2.62, which defines clear and convincing proof as "evidence of such convincing force that it demonstrates, in contrast to opposing evidence, a high probability of the truth of the fact[s] for which it is offered as proof[,]" without the additional language from *In re Angelia P.*, *supra*, 28 Cal.3d 908. (See *People v. Mabini* (2001) 92 Cal.App.4th 654, 662 (*Mabini*); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1165; *Mattco Forge, Inc. v. Arthur*

5

*Young & Co.* (1997) 52 Cal.App.4th 820, 847–850 (*Mattco Forge*); *Roberts v. Ford Aerospace & Communications Corp.* (1990) 224 Cal.App.3d 793, 804.)

In *Mabini*, the court explained that, in the early 1990's, Division Three of this district had criticized BAJI No 2.62 in dicta. (*Mabini*, *supra*, 92 Cal.App.4th at p. 660, citing *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 332–333 & fn. 29; *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 566; *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 487, fn. 8.) In a 2-1 decision in *Mattco Forge*, *supra*, 52 Cal.App.4th 820, 849, Division Three changed its position, finding that the more stringent language of *In re Angelia P.*, *supra*, 28 Cal.3d 908, would impose "a burden approaching the criminal burden, proof beyond a reasonable doubt." In *Mabini*, at page 662, Division Six of our district agreed with this analysis, and so do we. Appellants' reliance on the criticism of BAJI No. 2.62 that the majority in *Mattco Forge* disavowed is unwarranted.

As the *Mabini* court explained: "The key element of clear and convincing evidence is that it must establish a high probability of the existence of the disputed fact, greater than proof by a preponderance of the evidence. Our Supreme Court recognized the importance of this element in *In re Angelia P.*, *supra*, 28 Cal.3d at page 919: '"Clear and convincing" evidence requires a finding of high probability.' More recently, our Supreme Court stated, 'Evidence of a charge is clear and convincing so long as there is a "high probability" that the charge is true. [Citations.]' (*Broadman v. Commission on Judicial Performance* (1998) 18 Cal.4th 1079, 1090.) In support of its statement, the court cited *In re Angelia P.*, *supra*, 28 Cal.3d at page 919, and BAJI No. 2.62. (*Broadman v. Commission on Judicial Performance*, *supra*, 18 Cal.4th at p. 1090.)" (*Mabini*, *supra*, 92 Cal.App.4th at p. 662.) The *Mabini* court concluded that "'[w]ithout an additional mandate from the Supreme Court or the Legislature, BAJI No. 2.62 remains a correct instruction. [Citation.]'" (*Id.* at p. 663, quoting *Mattco Forge*, *supra*, 52 Cal.App.4th at p. 849.)

We decline to hold that CACI No. 201 should be augmented to require that "the evidence must be 'so clear as to leave no substantial doubt' and 'sufficiently strong as to

6

command the unhesitating assent of every reasonable mind."' Neither *In re Angelia P.*, *supra*, 28 Cal.3d 908, nor any more recent authority mandates that augmentation, and the proposed additional language is dangerously similar to that describing the burden of proof in criminal cases. (*Mattco Forge*, *supra*, 52 Cal.App.4th at p. 849.) The trial court did not err in rejecting it.

### B. Instructions on the Use of Restraints

One contested issue at trial was whether Nevarrez should have been restrained by a device fastening him to his bed or by installing side rails on the bed. The facility's administrator testified that side rails are considered a restraint when used to prevent a person who can walk from getting out of bed. The interdisciplinary team which met after each of Nevarrez's falls considered side rails and other restraints inappropriate during his first stay at San Marino since he was competent and could walk independently. The attending physician also testified he did not recommend restraints or side rails. He explained that restraints cause more problems than they solve, such as agitation and skin tears. Side rails increase the risk of injury for patients who are able to get over them and then fall from the level of the side rails rather than the level of the bed.[3]

Nevarrez's expert testified that restraints, such as padded side rails, should have been implemented during the first stay at San Marino, and the failure to do so, or to formally require a written refusal of a restraint, fell below the standard of care. There was conflicting evidence whether restraints were discussed with Nevarrez and his family and whether he or the family refused restraints. But it was undisputed he did not sign the form to formally refuse a restraint.

Appellants' special jury instructions 6 through 9 tracked the language of state regulations on the use of restraints: 6. "Restraints shall only be used with a written order of a licensed healthcare practitioner acting within the scope of his or her professional

---

[3] Side rails were implemented after Nevarrez fell during his second admission at the facility, but the facility administrator testified he was unable to walk independently by then. His eleventh fall was caused when he became agitated and kicked his bed while strapped in his wheelchair, causing the chair to tip backwards.

licensure." (former Cal. Admin. Code [now Cal.Code Regs.], tit. 22, § 72319, subd. (b).) 7. "The only acceptable forms of physical restraints shall be cloth vests, soft ties, soft cloth mittens, seat belts and trays with spring release devices. Soft ties means soft cloth which does not cause abrasion and which does not restrict blood circulation." (Cal. Code Regs., tit. 22, § 72319, subd. (c).) 8. "Restraints of any type shall not be used as punishment, as a substitute for more effective medical and nursing care, or for the convenience of staff." (Cal. Code Regs., tit. 22, § 72319, subd. (d).) 9. "The requirements for the use of physical restraints are: [¶] (1) Treatment restraints may be used for the protection of the patient during treatment and diagnostic procedures such as, but not limited to, intravenous therapy or catheterization procedures. Treatment restraints shall be applied for no longer than the time required to complete the treatment. [¶] (2) Physical restraints for behavior control shall only be used on the signed order of a physician, or unless the provisions of section 1180.4(e) of the Health and Safety Code apply to the patient, a psychologist, or other person lawfully authorized to prescribe care, except in an emergency which threatens to bring immediate injury to the patient or others. In such an emergency an order may be received by telephone, and shall be signed within 5 days. Full documentation of the episode leading to the use of the physical restraint, the type of physical restraint used, the length of effectiveness of the restraint time and the name of the individual applying such measures shall be entered in the patient's health record." (Cal. Code Regs., tit. 22, § 72319, subd. (i)(1) & (2).)

The trial court rejected these instructions on the ground that the use-of-restraint regulations did not "rise to the level of law." This was not a correct conclusion. A party may "base instructions on relevant state or federal regulations" since "[l]ike statutes, applicable regulations are a 'factor to be considered by the jury in determining the reasonableness of the conduct in question.'" (*In re Conservatorship of Gregory* (2000) 80 Cal.App.4th 514, 523.)

But the court was correct to question whether all use-of-restraint regulations were relevant. Instruction number 6, that restraints should be ordered by a physician, was relevant in light of the physician's refusal to order them during Nevarrez's first stay at the

8

facility. But without any evidence of an emergency or of treatment requiring restraints, it is unclear why instruction number 9 was relevant. Similarly unclear is the relevance of instruction number 7, on acceptable forms of restraints, which does not list bed rails even though there was testimony that bed rails are considered a form of restraint. Appellants argue their "theory of defense was in particular the subject of" instruction number 8, "[r]estraints of any type shall not be used . . . as a substitute for more effective medical and nursing care, or for the convenience of staff." While this language may be relevant, the proposed instruction quoted the full language of the regulation, which also prohibits the use of restraints as punishment. (Cal. Code Regs., tit. 22, § 72319, subd. (d).) That particular use of restraints was not at issue in this case.

The instructions, based solely on the text of the use-of-restraint regulations, were also incomplete pinpoint instructions. "In a proper instruction, '[w]hat is pinpointed is not specific evidence as such, but the *theory* of the defendant's case.' [Citation.]" (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.) Appellants argue that they were entitled to these instructions since the evidence supported a defense of regulatory compliance. But the use-of-restraint regulations, on their own, did not pinpoint that defense. Nor did they make clear that regulatory compliance "does not necessarily eliminate negligence"; instead, it "constitutes evidence for jury consideration with other facts and circumstances. [Citations.]" (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1830–1831.)

"'Although a party is entitled to instructions on his theory of the case, if reasonably supported by the pleadings and the evidence, instructions must be properly selected and framed. The trial court is not required to give instructions which are not correct statements of the law or are incomplete or misleading.' [Citation.]" (*In re Conservatorship of Gregory*, *supra*, 80 Cal.App.4th at p. 522.) Unlike Nevarrez's instructions on negligence per se, which incorporated particular regulations that appellants were claimed to have violated, appellants' instructions were not properly framed as instructions on regulatory compliance. Limited as they were to the text of the use-of-restraints regulations, the proposed instructions were incomplete and misleading.

9

Respondent cites the proposition that, to be complete, instructions on regulatory compliance must make clear that such compliance is not a complete defense. (See *Dragash v. Western Pac. R. R. Co.* (1958) 161 Cal.App.2d 233, 241–242 [error to refuse plaintiff's instruction that defendant's statutory compliance is not complete defense]; *Pennington v. Southern Pac. Co.* (1956) 146 Cal.App.2d 605, 613 [same].) Appellants argue the cases show it was "incumbent upon" Nevarrez to seek clarifying instructions. That may have been the case had the court actually given appellants' use-of-restraint instructions. (See *Carrau v. Marvin Lumber & Cedar Co.* (2001) 93 Cal.App.4th 281, 296–297 [objection or qualifying instruction required to avoid waiver when jury instruction incomplete].) But the court was not required to give the use-of-restraint instructions if they were incomplete, and the doctrine of waiver is inapplicable. The instruction that following a custom and practice does not excuse unreasonable conduct did not independently supply the missing element of appellants' instructions since customs and practices do not necessarily derive from statutes and regulations.

We conclude that the court did not err in rejecting appellants' proposed jury instructions based on the use-of-restraints regulations. Some of the regulations appear to have been irrelevant, and none was framed as an instruction on regulatory compliance. As proposed, the instructions did not provide guidance to the jury on how appellants' theory of defense would apply.

## II

Appellants argue the entire jury verdict was tainted by the erroneous admission into evidence of the citation issued by the DPH. We review a trial court's ruling on the admissibility of evidence for abuse of discretion. (*Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1111.) The error is reversible if it resulted in a miscarriage of justice. (*Id.* at p. 1114.)

10

## A. Citation

San Marino self-reported Nevarrez's April 24, 2009 fall to the DPH, and a DPH investigator issued a class A citation and a statement of deficiencies on March 2, 2010. Under the Long-Term Care, Health, Safety, and Security Act of 1973 (Health & Saf. Code, § 1417 et seq.), class A citations are issued when a nursing facility is determined to have violated a state or federal law or regulation relating to its operation or maintenance and the violation presents imminent danger or substantial probability of death or serious harm to a patient or resident. (Health & Saf. Code, §§ 1423, subd. (a), 1424, subd. (d); see *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 291.)[4] Both the class A citation and the statement of deficiencies were based on violations of a federal regulation applicable to facilities participating in Medicare and Medicaid, which requires such facilities to ensure: "(1) The resident environment remains as free of accident hazards as is possible; and [¶] (2) Each resident receives adequate supervision and assistance devices to prevent accidents." (42 C.F.R. § 483.25(h).) The DPH investigator who issued them found that Nevarrez was not provided with "adequate supervision and assistance in accordance with his care plan to prevent accidents" when San Marino failed to "[v]isually monitor [him] around the clock as indicated in the resident's care plan" and "[r]espond and provide supervision assistance in a timely manner when the personal alarm (which should have alerted staff that [Nevarrez] required assistance) became activated." The class A citation contained the additional finding that the violations "presented a substantial probability that death or serious physical harm would result."

---

[4] The most serious, Class AA, citation is issued when the violation is a "direct proximate cause of death of a patient or resident." (Health & Saf. Code, § 1424, subd. (c).) Class B citations are issued for less serious violations that have "direct or immediate relationship to the health, safety, or security of . . . patients or residents." (*Id.*, § 1424, subd. (e).) The Department of Health Services (DHS), which used to administer the act, was reorganized into the DPH and the Department of Health Care Services as of July 1, 2007. (See *California Assn. of Health Facilities v. Department of Health Services*, *supra*, 16 Cal.4th at p. 291; *Woods v. Horton* (2008) 167 Cal.App.4th 658, 664, fn. 2.)

11

The citation included the nursing home's plan of corrections, as well as the investigator's review of Nevarrez's records, three staff declarations, and an exit interview with the facility's administrator. It also included the investigator's conclusion that the April 24, 2009 fall could have been averted had staff answered Nevarrez's alarm right away and that it caused Nevarrez to sustain a subdural hematoma which required an emergency craniotomy and hospitalization.

*B. Trial Court Proceedings*

Nevarrez made a motion in limine to have the citation admitted into evidence. He argued it was admissible to establish negligence per se under *Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233 (*Norman*), and it fell within the exception to the hearsay rule for official records in Evidence Code section 1280.[5] Appellants opposed, and in turn moved to keep the citation out. They argued the class A citation was not final because it was on appeal, and the plan of correction was inadmissible, as were the investigator's opinions and conclusions. They also objected to the admission of the citation under Evidence Code section 352.

At the hearing on the motions in limine, appellants' counsel argued the DPH investigator's opinions and conclusions improperly encroached on the jury's role as a fact finder. The court noted it was "troubled by the admissibility of the actual citation" and intended to look into the issue further. It granted appellants' motion in limine to preclude the parties' experts from expressing opinion whether appellants violated any particular statute or regulation. The next day, the court granted Nevarrez's motion in limine to introduce the citation, ordering only that any hearsay statements within it be redacted. The court stated its ruling was consistent with *Norman*, *supra*, 107 Cal.App.4th 1233, where a DHS representative testified to his finding of violations at a nursing home. Appellants' counsel questioned whether, under the court's ruling, the DPH investigator

---

[5] Nevarrez also sought to introduce several pre-2009 deficiencies, none of which is relevant to this appeal.

12

would be allowed to testify about his opinion that the violation of the federal regulation satisfied the requirement for a class A citation. The court responded it would "have to take that up . . . more in the context of the testimony."

At trial, a custodian of records testified generally that the citation was an official DPH record. When it became clear that the DPH investigator who issued the citation would not testify,[6] appellants' counsel renewed his objection, arguing the citation contained the investigator's opinion on ultimate issues regarding negligence and neglect, and appellants were prejudiced because they had no opportunity to cross-examine the investigator regarding his qualifications and findings.

The court overruled the objection, ruling the citation admissible under Evidence Code section 1280. The court quoted a passage from the California Evidence Benchbook: "It is the decisional law generally that evidence of a statement of opinion in a writing that otherwise qualifies as an official record made by a public employee or as an official record of a birth, fetal death, death or marriage is admissible under the official records exception to the hearsay rule. If, one, the statement of opinion is primarily based on the declarant's personal observation; and, two, the statement of opinion is one that would be admissible if testified to by the declarant in court." (See 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2009) Exceptions to Hearsay Rule, § 5.14, p. 155.)

The citation was redacted to remove references to the three staff declarations. The plan of corrections, the reference to the exit interview with the facility's administrator, and the investigator's opinions and conclusions were not redacted. The citation was referenced repeatedly during the examination of various witnesses, and was the

---

[6] The record shows that Nevarrez subpoenaed the DPH investigator. Because he performed a Medicare survey, the investigator was considered an employee of the Department of Health and Human Services (DHHS), Centers of Medicare and Medicaid Services, a federal agency, which requested the withdrawal of the subpoena in light of a federal regulation (45 C.F.R. § 2.3) that described the procedure for requesting authorization of testimony by DHHS employees. Nevarrez's subsequent request for such authorization was denied on the ground that the investigator's testimony "would not be in the interests" of the DHHS.

13

cornerstone of the closing argument by Nevarrez's counsel. Counsel claimed generally: "[T]he state came in and investigated the facts. [¶] . . . [DPH] came in and conducted their investigation, exhibit one in this case is the class A citation. [¶] . . . [¶] Credibility of the evidence on liability or fault, we have the state's class A citation the highest citation that can be delivered against a nursing home in a live plaintiff. [¶] If the defense wanted to challenge that, this is the place to do it. Call witnesses, subpoena the investigator from DPH . . . [The] class A citation is an official document and it's just like we had somebody up there repeating it 20 times over . . . ."

Counsel argued the citation "already determined" there were violations of the Patient's Bill of Rights. He also argued there was negligence per se "because of the class A and the deficiency." The jury was given a negligence per se instruction specifically incorporating the violations on which the citation was based. With respect to this instruction, counsel told the jury: "[S]o if you look at exhibit one, that class A citation, you'll see this is the specific violation[;] the regulation[] has already been deemed violated, it's been found by the department that has nurses and doctors that review it, work it up, and issue . . . , so that's why, and I don't mean any cavalier approach actually to the jury, but the bill of rights and the negligence issues have largely been determined for you." Counsel argued the citation determined the issue of causation since the investigator stated "these violations presented . . . a substantial probability that death or serious physical harm would result." Counsel told the jury: "The only thing that wasn't determined in the class A is, is this an elder abuse case. You folks decide this." But despite this disclaimer, counsel led his argument on elder abuse with the citation and referred the jury to his earlier discussion of causation.

In their motions for a new trial and judgment notwithstanding the verdict, appellants argued the citation did not meet the official record exception requirements in section 1280 because it was not based on the investigator's personal knowledge and its contents therefore were not trustworthy. The court stated the evidence was admitted to establish that a citation had been issued, rather than to establish the truth of the contents of the citation.

14

*C. Analysis*

    *1. Abuse of Discretion*

"A court abuses its discretion if its ruling is '"so irrational or arbitrary that no reasonable person could agree with it."' [Citation.] A court's discretion also is limited by the applicable principles of law. [Citation.]" (*Garrett v. Howmedica Osteonics Corp.* (2013) 214 Cal.App.4th 173, 187.)

In initially ruling that the citation was admissible, the court relied on *Norman*, *supra*, 107 Cal.App.4th 1233. That reliance was misplaced. *Norman* held the trial court in that case erred in refusing to give a negligence per se instruction when that instruction was supported by a DHS investigator's testimony that he found the defendant nursing home had violated certain regulations. (*Id.*, at pp. 1243, 1247–1248.) The *Norman* court did not address the admissibility of the DHS investigator's testimony. A case is not authority for a proposition the court did not consider. (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.) Although the DHS investigator was allowed to testify to his conclusions, *Norman* does not render such testimony per se admissible. Similarly, in *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 90, the court found that a deficiency issued by the DHS raised triable issues of material fact regarding elder abuse, but it did so in the absence of an objection to the admissibility of DHS's records and expressly declined to hold that the records were "per se admissible." (*Id.* at p. 89, fn. 8.) In contrast, here the trial court was specifically asked to decide whether the citation was admissible. By relying on *Norman*, the court in essence avoided doing so.

Respondent argues the citation is admissible under the official records exception in Evidence Code section 1280. That section provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

Respondent argues the trustworthiness of the citation was established by the custodian of records, and the statutory presumption that official duties are properly performed (Evid. Code, § 664) shifted the burden to appellants to show the DPH investigator failed to accurately observe and record events. Appellants argue the citation lacks trustworthiness because it was issued a year after the April 24, 2009 incident and was based on the investigator's review of records and statements by San Marino staff. Indeed, with the exception of the investigator's personal observation that Nevarrez's room was 18 to 20 yards away and around a corner from the nurses' station, the citation relies on other sources of information, none of which qualifies for the official duties presumption. Because of that, the citation is not comparable to reports by public officers that are based on observations of other public employees. (See, e.g., *Rupf v. Yan* (2000) 85 Cal.App.4th 411, 430, fn. 6.)

The most prejudicial parts of the citation were the investigator's conclusions and the plan of correction, since the rest was either redacted, cumulative to other evidence adduced at trial, or not hearsay. There was no justification for not ordering the plan of correction redacted. Under Health and Safety Code section 1280, subdivision (f), plans of correction are not admissions by a party opponent, and they also are remedial measures under Evidence Code section 1151.

As to the investigator's opinions and conclusions, appellants relied on *Pruett v. Burr* (1953) 118 Cal.App.2d 188, 201 to argue that "'[n]otwithstanding the general rule that public records and reports are admissible in evidence, the courts almost universally exclude statements contained in such reports or records concerning the cause of or responsibility for an injury to the person or damage to property.' . . . 'One ground on which such a report is excluded is that the statement as to the cause of or responsibility for the occurrence is a mere statement of opinion, and that since the officer or employee would not be permitted to state his opinion if on the witness stand, there is all the more reason for excluding his statement of opinion when he is not under oath and is not subject to cross-examination.'" The court admitted the citation on the assumption that the investigator's opinions were admissible because they were based on the investigator's

16

own observations. This assumption was inconsistent with the court's ruling that the citation be redacted to remove any hearsay. That ruling indicated the investigator's opinions were not solely or primarily based on his own observations or on admissible hearsay.

The court assumed the investigator would have been allowed to testify to his opinions at trial. This assumption was inconsistent with the court's ruling that the parties' experts could not testify whether a statute or regulation had been violated. Admissible expert opinion testimony is not objectionable just because it embraces the ultimate issue to be decided by the trier of fact. (See Evid. Code, § 805.) But there are limits to such testimony. '"[T]he rationale for admitting opinion testimony is that it will assist the jury in reaching a conclusion called for by the case. "Where the jury is just as competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates." [Citation.]' [Citations.]" (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1183 (*Summers*).) Additionally, an expert may not testify about issues of law or draw legal conclusions. (*Id.* at p. 1178.)

In ruling that the parties' experts could not testify that appellants violated any particular laws, the court apparently agreed that such testimony would be an improper legal conclusion and would interfere with the jury's function as a fact finder. The correctness of this ruling has not been challenged. Whether or not the DPH investigator qualified as an expert witness, there would have been no rational basis for treating him any differently than the parties' expert witnesses and allowing him to opine that San Marino violated the law.

Additionally, the admission of the class A citation created the risk that it would be used to establish not only that a regulation was violated for purposes of negligence per se, but to insinuate, as Nevarrez's counsel did, that appellants must be liable because "the state" issued San Marino "the highest citation that can be delivered against a nursing home," short of a citation based on a resident's death. Appellants initially objected under Evidence Code section 352. The record does not indicate that the court balanced the

17

probative value of the citation against the danger of undue prejudice or jury confusion. Although appellants have not specifically cited Evidence Code section 352 on appeal, they complain that the citation was largely used to predetermine the case and confuse the jury. We agree, and conclude that the trial court abused its discretion in admitting it into evidence.

### 2. *Prejudice*

A miscarriage of justice occurs if, based on the entire record, including the evidence, it is reasonably probable the jury would have reached a result more favorable to appellants absent the error. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800.) "'"[P]robability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.' [Citation.]" (*Ibid.*)

Appellants argue the citation was used to establish their liability on all three causes of action. We examine the alleged prejudicial effect on each of cause of action separately.

### a. *Violation of the Patient's Bill of Rights*

This cause of action was based on Health and Safety Code section 1430, subdivision (b), which allows a resident or patient of a skilled nursing facility to "bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patient's Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation." Appellants argue the jury's finding of 14 violations of the Patient's Bill of Rights should be reversed because the citation was the centerpiece of the closing argument by Nevarrez's counsel. Nevarrez's counsel did argue the citation already had determined that the Patient's Bill of Rights was violated. But the special verdict indicates the jury was not misled by this argument.

One alleged violation was of the right to be "free from mental and physical abuse." (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9).) Nevarrez's counsel argued that the citation "unequivocally answered" that such a violation occurred. The jury rejected counsel's argument, finding no such violation. Another alleged violation was of Health

18

and Safety Code section 1599.1, subdivision (a), which states: "The facility shall employ an adequate number of qualified personnel to carry out all of the functions of the facility." The jury found this provision was violated on six days. But this finding was not based on the citation, which did not address understaffing. Rather, the finding was based on the testimony of Nevarrez's expert about nursing hours reflected in a key factor report, which both counsel referenced in closing argument.

The third alleged violation was of the right "[t]o receive all information that is material to an individual patient's decision concerning whether to accept or refuse any proposed treatment or procedure. The disclosure of material information for administration of . . . physical restraints . . . shall include the disclosure of information listed in Section 72528(b)." (Cal. Code Regs., tit. 22, § 72527, subd. (a)(5).) This requires disclosing "[t]hat the patient has the right to accept or refuse the proposed treatment, and if he or she consents, has the right to revoke his or her consent for any reason at any time." (Cal. Code Regs., tit. 22, § 72528, subd. (b)(6).) The citation said nothing about restraints or disclosure of information, and Nevarrez's counsel did not argue that it established a violation of these regulations. Instead, counsel focused on the undisputed evidence that Nevarrez had not signed a form either accepting or refusing restraints. Based on that, counsel argued restraints were never offered to Nevarrez during his first stay at the facility. The jury found eight separate violations of the disclosure requirement.

We find no indication that the citation played any role in the jury's finding of violations of the Patient's Bill of Rights. The DPH investigator did not find any such violations, and the jury apparently rejected the invitation by Nevarrez's counsel to defer to the citation, relying instead on other evidence counsel highlighted in his closing argument. Finding no prejudice, we affirm the portion of the jury's verdict on the Patient's Bill of Rights.

*b. Negligence*

Under the negligence per se doctrine, negligence is presumed if "(1) [the defendant] violated a statute, ordinance, or regulation; (2) the violation proximately

19

caused death or injury to [the plaintiff]; (3) the death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) the [plaintiff] . . . was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." (Evid.Code, § 669, subd. (a).) The first two elements are questions of fact for the jury to decide if there are factual disputes. (*Padilla v. Pomona College* (2008) 166 Cal.App.4th 661, 675.) The second two elements are questions of law to be resolved by the court. (*Norman*, *supra*, 107 Cal.App.4th at pp. 1246–1248.) The presumption of negligence may be rebutted "by proof that the violator did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law. [Citation.]" (*Id.* at p. 1246.)

Each of the negligence per se instructions given in this case incorporated either a regulation or a statute that Nevarrez claimed appellants had violated. These included three state regulations and one state statute: "Each facility shall employ sufficient nursing staff to provide a minimum of 3.2 nursing hours per patient day" (Cal. Code Regs., tit. 22, § 72329.1, subd. (f).); "[n]ursing service shall include, but not be limited to, the following: . . . [¶] Implementing of each patient's care plan according to the methods indicated. Each patient's care shall be based on this plan" (Cal. Code Regs., tit. 22, § 72311, subd. (a)(2)); "[p]atients shall have the right . . . [¶] . . . to be free from mental and physical abuse" (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9)); and "[t]he facility shall employ an adequate number of qualified personnel to carry out all of the functions of the facility" (Health & Saf. Code, § 1599.1, subd. (a)). The negligence per se instructions also incorporated the federal regulation on which the citation was based: "The facility must ensure that— [¶] (1) The resident environment remains as free of accident hazards as is possible; and [¶] (2) Each resident receives adequate supervision and assistance devices to prevent accidents." (42 C.F.R. § 483.25(h).)

As to each negligence per se instruction, the jury was told: "If you decide that San Marino Skilled Nursing and/or Country Villa violated this law, and two, that the violation was a substantial factor in bringing about the harm, then you must find that San Marino

20

Skilled Nursing and/or Country Villa was negligent unless you also find that the violation was excused. [¶] If you find that San Marino Skilled Nursing and/or Country Villa did not violate this law, or that the violation was not a substantial factor in bringing about the harm, or if you find the violation was excused, then you still must decide whether San Marino Skilled Nursing and/or Country Villa was negligent in light of the other instructions."

In closing argument, Nevarrez's counsel referred the jury to the citation, arguing that DPH, which "has nurses and doctors" who work up, review and issue citations, already had found a regulatory violation, so that the "negligence issues have largely been determined for you." Similarly, counsel argued DPH already had determined the issue of causation. The jury found appellants negligent, but the special verdict form does not indicate under what theory.

Since the jury was instructed that it could find defendants negligent based solely on the violations of the federal regulation on which the citation also was based, and counsel represented to the jury that DPH already had determined the negligence issues, it is reasonably probable that the citation influenced the jury's decision on negligence. This is equally so because Nevarrez's counsel insinuated that the citation, a result of a "state" investigation of the facts, impeached the credibility of appellants' expert witnesses, whom counsel characterized as "hired experts." Thus, the citation was offered essentially as an endorsement by the government of Nevarrez's case against appellants.

The DPH investigator's findings were that the facility failed to visually monitor Nevarrez around the clock, contrary to his care plan, and failed to respond to his personal alarm in a timely manner. These findings were not overwhelmingly supported by the evidence. Rather, the evidence was in dispute whether around-the-clock visual monitoring was part of Nevarrez's care plan at the time of his ninth fall, on April 24, 2009. The facility administrator testified visual monitoring was an unusual measure implemented for 24 hours after the April 21 fall. It was not listed among the intervention measures to be continued after the April 23 fall. Appellants' expert testified that the standard of care did not require constant monitoring.

21

Also disputed was whether the nurses' response on April 24 was inappropriate. Appellants' expert testified the two-minute response by two staff members was prompt. Nurse De La Victoria testified Nevarrez already was using the toilet and appeared to be stable on his feet when staff arrived. The expert testified the decision not to approach "a male resident standing at the commode urinating" was "a nursing judgment." The jury's ability to assess the credibility and weight to be given this testimony was compromised since it was told that, in the citation, "the state" had already determined the issue of negligence. As used by Nevarrez's counsel, the citation in essence shifted responsibility for decision on this issue to the government. (See *Summers*, *supra*, 69 Cal.App.4th 1155, 1182–1183 [witness' expression of general belief how case should be decided is inadmissible legal conclusion, of no value to trier of fact, and shifts responsibility for decision to witness]; see also *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1040 [verdict tainted by use of inadmissible evidence to impeach plaintiff's credibility].)

Of the other negligence per se theories, one was based on a violation of the right to be free from mental and physical abuse. (Cal. Code Regs., tit. 22, § 72527, subd. (a)(9).) As we have explained, the jury expressly found this provision of the Patient's Bill of Rights was not violated, and it is therefore unlikely that the negligence verdict could have been based on this theory.

Two other negligence per se theories were premised on violations of staffing laws. (Health & Saf. Code, § 1599.1, subd. (a); Cal. Code Regs., tit. 22, § 72329.1, subd. (f).) While the jury found six violations of the Patient's Bill of Rights based on understaffing, that cause of action did not require it to determine causation. But causation was required for the finding of negligence. De La Victoria testified the delay in his response to Nevarrez's alarm was due to the fact that he was helping another patient. He also testified fewer nurses were working that night shift. But whether understaffing caused De La Victoria's delay in response was disputed, as was whether the delay caused Nevarrez's injury. Yet, the DPH investigator concluded the two-minute delay in responding to Nevarrez's alarm was unreasonable and as a result Nevarrez was injured.

22

Counsel argued to the jury that the DPH determined the issue of causation. Thus, it is reasonably probable that the jury's finding of causation on this theory was influenced by the citation. Another negligence per se theory was based on a violation of a state regulation regarding the implementation of a patient's care plan. (Cal. Code Regs., tit. 22, § 72311, subd. (a)(2).) That theory also overlapped with one of the violations found by the DPH investigator. Thus, none of the theories on which the negligence verdict could have been based was insulated from the effect of the citation.

We conclude the citation tainted the verdict on negligence, and we reverse that part of the verdict, along with the jury award of damages.[7]

### c. Elder Abuse

"The Elder Abuse Act makes certain enhanced remedies available to a plaintiff who proves abuse of an elder, i.e., a 'person residing in this state, 65 years of age or older.' (Welf. & Inst. Code, § 15610.27.) In particular, a plaintiff who proves 'by clear and convincing evidence' both that a defendant is liable for physical abuse, neglect or financial abuse (as these terms are defined in the Act) and that the defendant is guilty of 'recklessness, oppression, fraud, or malice' in the commission of such abuse may recover attorney fees and costs. (*Id.*, § 15657, subd. (a).)" (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 404 (*Carter*).) As defined by the act, neglect is "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code, § 15610.57, subd. (a)(1).) "Recklessness involves "'deliberate disregard" of the "high degree of probability" that an injury will occur' and 'rises to the level of a "conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it."'" [Citation.]" (*Carter*, at p. 405.) To recover enhanced remedies under the act, "a plaintiff must prove more than simple or even gross negligence in the provider's care or custody of the elder. [Citation.]" (*Ibid.*)

---

[7] Because we reverse the jury award of damages, we do not reach appellants' challenges to the amount of damages.

The jury found neglect and recklessness by clear and convincing evidence. Respondent argues the citation was merely cumulative and the jury verdict was overwhelmingly supported by other evidence. We agree with appellants that it begs the question why Nevarrez's counsel relied on the citation so heavily and urged the jury to do the same if the evidence were indeed overwhelming.

Respondent's claim that the facility never assisted Nevarrez on his trips to the bathroom is not supported by the record, which indicates that he was provided with "limited assists" on transfers from his bed "to the chair to the wheelchair to the toilet." We already noted that the appropriateness of using restraints during Nevarrez's first stay at the facility was disputed, as was the promptness and appropriateness of the two nurses' response on the night of his ninth fall. Whether the facility was understaffed also was disputed, as was the relevance of understaffing and other alleged violations, to Nevarrez's injury. As with negligence, a finding of causation was required for elder abuse, and Nevarrez's counsel argued to the jury that the DPH already had determined the issue of causation.

We conclude that the erroneous admission of the citation tainted the jury verdict on elder abuse, and we reverse that portion of the verdict.[8] We also reverse the court's award of $952,142.50 in attorney fees. Although the court noted the award was authorized for violations of both the Elder Abuse Act (Welf. & Inst. Code, § 15657, subd. (a)) and the Patient's Bill of Rights (Health & Saf. Code, § 1430, subd. (b)), it did not apportion the award.

### III

Health and Safety Code section 1430, subdivision (b), allows "a civil action against the licensee of a facility who violates any rights of the resident . . . ." Under the statute, "[t]he licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation to continue." (*Ibid*.)

---

[8] Because we reverse based on evidentiary error, we do not consider appellants' argument that the verdict on elder abuse was not supported by substantial evidence.

The trial court awarded $500 for each of the 14 violations of the Patient's Bill of Rights that the jury found, for a total of $7,000 in civil penalties under this provision. We agree with appellants that these penalties were excessive.

"When interpreting statutes, we begin with the plain, commonsense meaning of the language used by the Legislature. [Citation.] If the language is unambiguous, the plain meaning controls. [Citation.]" (*Voices of the Wetlands v. State Water Resources Control Bd.* (2011) 52 Cal.4th 499, 519.) The statutory language does not authorize the award of $500 per violation. It permits a resident to bring a civil action against a licensee of a facility that violates any "rights" of the resident and authorizes a civil penalty of "up to" $500. The statutory language indicates $500 is the maximum that can be recovered in a civil action under this provision, regardless of how many rights are violated or whether such rights are violated repeatedly. The statutory language also indicates that $500 is not intended to be a flat penalty, but rather the maximum amount in a range of possible penalties.

Health and Safety Code section 1430 is part of the Long-Term Care, Health, Safety, and Security Act of 1973 (Health & Saf. Code, § 1417 et seq.). As we already explained, section 1424 of that act authorizes the issuance of class AA, A, and B citations. It also authorizes a range of penalties within stated minimum and maximum amounts that can be imposed "for each citation," rather than for each violation, since one citation may cover more than one violation. (See, e.g., *Norman*, *supra*, 107 Cal.App.4th at p. 1238, 1243 [class A, reduced to class B, citation issued for several violations]; see also *Kizer v. Waterman Convalescent Hospital, Inc.* (1992) 10 Cal.App.4th Supp. 8, 12 [class A citation issued for multiple violations].) This supports our conclusion that, in a civil action, Health and Safety Code section 1430 authorizes the imposition of a range of penalties up to the statutory maximum of $500.

We reverse the court's award of $7,000 in penalties for the violation of the Patient's Bill of Rights because it is over the statutory maximum. The court should recalculate it on remand.

25

**DISPOSITION**

The judgment is affirmed solely as to the jury's verdict on the Patient's Bill of Rights. In all other respects the judgment is reversed. The case is remanded to the trial court for further proceedings consistent with this opinion.

Appellants are entitled to their costs on appeal.


**CERTIFIED FOR PUBLICATION**


                                        EPSTEIN, P. J.

We concur:


        WILLHITE, J.


        SUZUKAWA, J.